FILED
United States Court of Appeals
Tenth Circuit

September 10, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JOHN NIEMI; ROBERT NAEGELE, III;
JESPER PARNEVIK,

 Plaintiffs - Appellees,

v.

ERWIN LASSHOFER; INNOVATIS
GMBH; INNOVATIS IMMOBILIEN
GMBH; INNOVATIS ASSET
MANAGEMENT SA,

 Defendants - Appellants,

and

MICHAEL FRANK BURGESS;
LEXINGTON CAPITAL & PROPERTY
INVESTMENTS, LLC; BARRY FUNT,

 Defendants.

No. 12-1233
(D. Colo.)
(D.C. No. 1:12-CV-00869-RBJ)

---

**ORDER**

---

Before **TYMKOVICH**, **GORSUCH**, and **HOLMES**, Circuit Judges.

---

This matter is before the court to correct small clerical errors found on pages 6, 7,

and 12 of the opinion that originally issued on September 6, 2013. The corrected version

is attached, and the decision shall reissue nunc pro tunc to the original filing date.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

September 6, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JOHN NIEMI; ROBERT NAEGELE, III;
JESPER PARNEVIK,

     Plaintiffs-Appellees,

v.

ERWIN LASSHOFER; INNOVATIS
GMBH; INNOVATIS IMMOBILIEN
GMBH; INNOVATIS ASSET
MANAGEMENT SA,

     Defendants-Appellants,

and

MICHAEL FRANK BURGESS;
LEXINGTON CAPITAL & PROPERTY
INVESTMENTS, LLC; BARRY FUNT,

     Defendants.

No. 12-1233

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:12-CV-00869-RBJ)

---

Kevin D. Evans (Phillip L. Douglass with him on the briefs), of Steese, Evans & Frankel,
P.C., Denver, Colorado for Defendants-Appellants.

Christopher W. Madel of Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, Minnesota (Robert N. Miller and Stephanie E. Dunn of Perkins Coie LLP, Denver, Colorado, with him on the briefs), for Plaintiffs-Appellees.

---

Before **TYMKOVICH, GORSUCH,** and **HOLMES**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

An unconventional real estate financing scheme presents us with some unconventional legal questions. Questions ranging from whether an Austrian financier should be denied access to the American legal system because he failed to comply with an order freezing his assets worldwide — to whether the district court had the power to issue such a far-flying order in the first place.

Our case starts in Breckenridge and lean economic times. John Niemi and his business partners set out to build a large luxury ski condominium complex in two phases, working through a set of companies controlled by Mesatex, LLC. But traditional financing proved hard to find: after completing the first phase of development they found no bank willing to loan the $220 million needed to finish the project. So they began casting about for alternative sources.

They found a shady one in Michael Burgess. A Florida businessman, Mr. Burgess claimed to represent a European investor, Erwin Lasshofer, with an easy $250 million at hand. All Mesatex had to do to secure a loan was to pay a $180,000 commitment fee and provide another $2 million as a collateral deposit. This Mesatex did, but the promised

loan never materialized. Where the $2.18 million wound up is anyone's guess, but for his part in the scheme Mr. Burgess eventually found himself in federal prison serving time for fraud and money laundering.

Of course, Mr. Burgess's sentence did little to satisfy Mesatex and its investors. They wanted their money back, and damages too. So they brought this lawsuit alleging that the lost loan wrecked Mesatex's business, caused it millions in lost profits, and sent its properties into foreclosure. But for whatever reason, neither Mesatex nor any of its subsidiaries — the only parties to the loan arrangements with Mr. Burgess — was included as a party to this lawsuit. Instead, the suit named only Mr. Niemi, Robert Naegele, and Jesper Parnevik — Mesatex's investors — as plaintiffs. A tactical decision with consequences that will become apparent soon enough.

As defendants Mr. Niemi and his fellow investors named not just Mr. Burgess and Mr. Lasshofer. Thinking here about the relevant companies, the plaintiffs sued as well the Innovatis Group, a set of foreign companies associated with Mr. Lasshofer. Proceeding under (among other laws) the Racketeer Influenced and Corrupt Organizations Act and the Colorado Organized Crime Control Act, Mr. Niemi and the other plaintiffs demanded as much as $150 million in relief. *See* 18 U.S.C. §§ 1961-1968; Colo. Rev. Stat. §§ 18-17-101 to 109.

Soon enough Mr. Burgess and Mr. Lasshofer began the finger pointing. Mr. Burgess insisted he was just following Mr. Lasshofer's instructions. Mr. Lasshofer rejoined that he found himself unwittingly in business with a con man. Unpersuaded that

Mr. Lasshofer was quite the innocent he claimed to be, the district court in June 2012 granted the plaintiffs' motion for a preliminary injunction, effectively freezing the worldwide assets of Mr. Lasshofer and the corporate defendants and ordering them to deposit $2.18 million in escrow pending a final judgment. It is this interlocutory order Mr. Lasshofer and the corporate defendants now ask us to undo. *See* 28 U.S.C. § 1292(a)(1).

\* \* \*

Mr. Niemi and his colleagues say we should dismiss the defendants' appeal summarily, without reaching the merits. They offer two reasons why.

In the first place, they insist this appeal is moot. Moot because the district court granted a *second* preliminary injunction in October 2012 affording the same relief as the June 2012 injunction that's the subject of this appeal. In the plaintiffs' view, the June 2012 injunction no longer does any independent work of its own and anything we might say about its propriety would be academic because the October 2012 injunction hasn't been appealed and will remain in force no matter what we do. Put plainly, Mr. Niemi and his colleagues argue the defendants needed to appeal both orders and didn't.

This line of attack rests on a faulty premise. Even a glance at the two injunctions reveals that they are not at all the same, contrary to the plaintiffs' representations. The October 2012 injunction controls only the disposition of approximately $6.8 million in a specific numbered bank account located in Switzerland and belonging to one of the corporate defendants. The June 2012 injunction, meanwhile, binds both Mr. Lasshofer and all the corporate defendants; it freezes virtually all their assets anywhere in the world;

- 6 -

and it requires them to deposit $2.18 million in an escrow account.  Pretty plainly, the June 2012 injunction does quite a bit of lively work all its own, and the dispute over its issuance is anything but academic.  *Cf. Wyoming v. U.S. Dep't of Interior*, 587 F.3d 1245, 1250 (10th Cir. 2009) (finding an order moot because it no longer had any "effect in the real world") (internal quotation marks omitted).

Alternatively, Mr. Niemi and his colleagues suggest we *still* shouldn't reach the merits of the appeal because of the "fugitive disentitlement doctrine."  The plaintiffs note that Mr. Lasshofer and the corporate defendants have failed to abide fully the terms of the June 2012 preliminary injunction.  In fact, since we heard argument in this appeal, the district court apparently first held Mr. Lasshofer and his companies in (civil) contempt — for failing to deposit the $2.18 million in escrow as ordered — and then entered a default judgment against them for nearly $62 million.  In the plaintiffs' view, the defendants should not be allowed to challenge on appeal the lawfulness of an order they have defied in the district court.

But the so-called "fugitive disentitlement doctrine" doesn't do nearly so much work as this.  To understand the doctrine's pedigree is to understand why.  At common law, when someone was charged with a crime but failed to appear for trial, he was deemed an outlaw — a term the common law didn't use lightly.  An outlaw was, literally, outside the law's protection.  His goods and chattels were forfeit to the crown, he could be punished just as if he had been convicted, and — in the earliest days — he could be killed with impunity.  4 William Blackstone, Commentaries *319-20.  Happily, the criminal law has

- 7 -

long since abandoned outlawry. *See United States v. Hall*, 198 F.2d 726, 727-28 (2d Cir. 1952). But this humane advance brought with it new questions of its own. If the absconding defendant is no longer *entirely* outside the law's protection, the question inevitably arises: which specific legal protections is he entitled to? Surely his life now receives a degree of protection — pursuers are supposed to try to arrest the fugitive rather than feel free to slay him on sight. 4 William Blackstone, Commentaries \*320. And no trial can begin without his presence. *See Crosby v. United States*, 506 U.S. 255, 262 (1993); *see also* Fed. R. Crim. P. 43(a), (c)(1)(A). But what happens if he flees after indictment or conviction? Can he use the legal system to challenge the charges against him from the safety of his hideout? Does the law give a fleeing criminal defendant protection enough to do *that*? The answer courts have arrived at is a firm no, and today we call that answer by this mouthful — the "fugitive disentitlement doctrine."

Courts have adopted this rule in order to avoid turning trials and appeals into unenforceable farces. If a defendant could file motions and appeals while on the lam, any litigation would risk devolving into nothing more than a rigged game, a sort of no-lose proposition for the defendant in which an adverse judgment would guarantee only a continuation of the chase — "heads, I win; tails you can't find me." *See Allen v. Georgia*, 166 U.S. 138, 141 (1897); *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1097 (1st Cir. 1992). Contemporary fugitive disentitlement doctrine exists to rebalance the playing field, to afford courts the "discretion to refuse to hear a criminal case . . . unless the convicted party [or charged defendant] . . . is where he

can be made to respond to any judgment we may render." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 240 (1993); *see also Bonahan v. Nebraska*, 125 U.S. 692 (1887); *Smith v. United States*, 94 U.S. 97 (1876).

Precisely none of this helps Mr. Niemi and his colleagues. So far as we know, neither Mr. Lasshofer nor any of his companies has been charged with (let alone convicted of) crimes, and they aren't hiding from the law — the usual preconditions for the doctrine's application. Instead, they seem to be in their home countries, Austria and Panama, going about their business as usual, if in contempt of civil court orders here. All this leaves the plaintiffs to argue less for an *application* of the fugitive disentitlement doctrine than for a serious *extension* of it. They want us to disentitle not a criminal in hiding, but a civil litigant who has chosen to sit defiantly at home.

That is quite a leap. To date, the plaintiffs can point to only one small step we've taken in the direction they encourage. This court has held that aliens hiding from deportation orders cannot simultaneously challenge those orders in court. We've done so explaining that the rationale underlying the doctrine in the criminal context applies with equal force in the immigration context: a fugitive alien makes the enforcement of any deportation order against him impossible, just as a fugitive defendant does with the criminal judgment against him — in this way again turning the litigation into a one-way street. *See Martin v. Mukasey*, 517 F.3d 1201, 1204-05 (10th Cir. 2008); *Sapoundjiev v. Ashcroft*, 376 F.3d 727, 729-30 (7th Cir. 2004). The only other time we tried to extend the doctrine into the civil arena — a case involving a civil forfeiture action itself closely tied

to a criminal case — the Supreme Court later firmly rebuffed our efforts. *See Degen v. United States*, 517 U.S. 820, 825 (1996), *abrogating United States v. Timbers Preserve*, 999 F.2d 452, 455 (10th Cir. 1993).

Even worse for the plaintiffs, the Supreme Court long ago expressly rejected the very idea they ask us to accept — that a civil contemnor loses the right to participate further in his case because he — as here — failed to deposit funds in the court's registry pursuant to a court order. *See Hovey v. Ellott*, 167 U.S. 409, 411-14 (1897). The plaintiffs' suggestion that we turn away a civil contemnor's interlocutory appeal sits more than a little awkwardly, too, with the law's jealous insistence in other situations that a civil litigant must invite and accept contempt as the price to be paid for earning the right to pursue an interlocutory appeal. *See, e.g.*, *United States v. Copar Pumice Co.*, 714 F.3d 1197, 1206-07 (10th Cir. 2013).

Quite apart from these formal problems with the plaintiffs' invitation to extend into mainstream civil litigation a doctrine rooted in crime, the rationale underlying the doctrine simply isn't in play here. The reason it isn't lies in the difference between cash and the corporeal. In crime, the absence of the defending party's person prevents a trial and the execution of an adverse judgment. Any litigation could only inhere to his advantage, creating a one-way street. But the same isn't necessarily true when lucre rather than liberty is at stake. When only money is at stake, a court *can* usually proceed to issue an executable judgment even if the defendant chooses not to appear. Before final judgment, the court can try contempt orders to cajole his appearance and compliance. Failing that,

the court can proceed to judgment without him, by entering a default judgment in a sum certain that provides the plaintiff with an executable interest in the defendant's assets. *See* Fed. R. Civ. P. 37(b), 55. After a final judgment, too, an absent civil defendant cannot appeal without either posting a bond or coming to court and winning a stay. *See* Fed. R. Civ. P. 62. In all these ways, a civil defendant's physical absence doesn't guarantee him the chance to turn proceedings into a no-lose game. After outlawry's demise, the criminal law may have needed something like the fugitive disentitlement doctrine to deal with the problem of the absent party, but mainstream civil law has evolved many rule-based solutions of its own adapted to its special circumstances to ensure evasion doesn't always pay. Our case nicely illustrates the point: the plaintiffs have already won a default judgment against the defendants in the amount of $62 million and are presumably busy working to execute that judgment, just as the law entitles them to do. *See Degen*, 517 U.S. at 827.

The fugitive disentitlement doctrine provides a discretionary remedy whose provenance lies in the common law or "inherent powers" of a court. *Degen*, 517 U.S. at 823-24. We are always hesitant about deploying authority of that kind, especially when existing rules or statutes anticipate and address the same subject. *See id.*; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46-47 (1991) (inherent power to sanction bad-faith conduct "fill[s] in the interstices" of federal statutes and rules). This isn't to say a court's common law or inherent powers are always enervated when rules and statutes touch on the same subject. *See Chambers*, 501 U.S. at 46. Or even that the disentitlement doctrine might

never come to play some role in the civil arena: we do not claim foresight enough to anticipate every contingency. But the existence of so many civil rules adapted to the particular problem the plaintiffs face in this case surely casts their demand that we dismiss this appeal before hearing it in an unattractive light.

* * *

With that and at long last, we turn to consider the defendants' appeal.

Mr. Lasshofer and the corporate defendants argue that the preliminary injunction must be overturned because of *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.* There the Supreme Court held that, in cases seeking money judgments, federal district courts do not possess the inherent equitable power to issue preliminary injunctions preventing the transfer of assets in which the plaintiffs claim no pre-existing lien or equitable interest. 527 U.S. 308, 310, 333 (1999). Yet that, the defendants argue, is exactly what happened here: in the June 2012 preliminary injunction the district court purported to freeze all of their assets worldwide, whether or not connected in any way to the allegations in this case and no matter if they greatly exceeded the amount of damages sought. Because the district court overstepped the bounds of its inherent authority, the defendants say, we must reverse.

The defendants' argument here, like both of the plaintiffs' arguments before it, overstates its case. No doubt, *Grupo Mexicano* held that district courts lack *inherent* authority to issue preliminary injunctions like the one here, just as the defendants suggest. But the Supreme Court in *Grupo Mexicano also* acknowledged that Congress can and

- 12 -

sometimes has added to the inherent authority of courts by statute, allowing courts to enter preliminary injunctions freezing assets on a national or international basis. *Id.* at 325-26. *And* the Court expressly left open the question whether a district court sitting in diversity can issue an injunction along these same lines when state law permits. *Id.* at 318 n.3. That last possibility is notable here because it's the one the district court invoked in this case. When issuing its injunction, the district court pointed to subsection (6) of the civil-remedies section of COCCA, Colorado's anti-racketeering law, and said that statutory subsection gave it the authority to grant the preliminary relief it did. *See* Colo. Rev. Stat. § 18-17-106(6); *see also* Fed. R. Civ. P. 64(a) ("[T]hroughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."). So saying the district court lacked inherent authority to do as it did gets the defendants nowhere for the simple reason that the district court never purported to rely on its inherent authority, but expressly relied instead on state statutory authority.

Of course, *Grupo Mexicano* didn't resolve — only highlighted — the question whether state law can expand the equitable powers of a federal court sitting in diversity. For its part, the district court ventured an affirmative answer to the question because of *FDIC v. Antonio*, 843 F.2d 1311 (10th Cir. 1988). As a matter of state law, *Antonio* held that subsection (6) of COCCA's civil remedies section authorizes courts to issue preliminary injunctions seizing assets even in the absence of a pre-existing lien or equitable interest. As a matter of federal law, *Antonio* saw no reason to doubt that a

- 13 -

district court operating under the diversity statute could exercise this same authority. *Id.* at 1312-14. In light of these twin holdings, the district court in this case held that it possessed authority to issue its preliminary injunction.

The defendants take issue with the district court's analysis but give us too little to work with. For example, they argue that *Antonio* is no longer good law after *Grupo Mexicano*. But they (again) disregard the fact that *Grupo Mexicano* purported to speak only to a district court's inherent authority to issue preliminary injunctions and expressly left open the question of a district court's authority to issue preliminary injunctions under the diversity statute and state law. Separately, the defendants before us fault the defendants in *Antonio* for failing to identify federal statutory limits on the authority of a district court sitting in diversity to impose a preliminary injunction authorized by state law. But then Mr. Lasshofer and the corporate defendants themselves fail to identify any such limits in their briefing in this case. They point to § 11 of the Judiciary Act of 1789. But that provision says only that federal courts shall have cognizance of civil suits "at common law or in equity," *see* 1 Stat. 73, 78, and the defendants never explain how that language prohibits a federal court authorized by Congress's diversity statute to apply state law from granting preliminary injunctive relief authorized by state law.

This isn't to suggest a federal court sitting in diversity may always and everywhere impose a remedy authorized by state law. The Supreme Court has told us that it's a mistake to assume "that whatever equitable remedy is available in a State court must be available in a diversity suit in federal court." *Guaranty Trust Co. v. York*, 326 U.S. 99,

- 14 -

105 (1945). The difficulty is that the defendants haven't developed a theory why, as a matter of federal law, the district court in this case couldn't issue a preliminary injunction authorized by COCCA. A good argument might exist — we do not prejudge what arguments other parties might muster in other cases — but none's been made here.

There is, however, another, related problem lurking here, one neither party has addressed. As a matter of state law, *Antonio* held that subsection (6) of COCCA's civil-remedies section authorizes preliminary injunctions freezing assets worldwide. *See* Colo. Rev. Stat. § 18-17-106(6). But by its terms, subsection (6) permits preliminary injunctive relief only in cases "proceeding under subsection (1)." In turn, subsection (1) governs cases seeking permanent equitable relief. The complaint in this case, however, doesn't request any form of permanent equitable relief, only damages. *See* Complaint, No. 1:12-CV-869-RBJ, at ¶¶ 261, 282, 292 (D. Colo. Apr. 4, 2012). Damages actions proceed under subsection (7) — not subsection (1) — and subsection (7) does not mention, let alone authorize, preliminary injunctive relief. Put simply, as a matter of state law COCCA appears to authorize preliminary injunctive relief in cases seeking permanent equitable relief, but not (as here) cases seeking only damages.[1]

---

[1] Here are the relevant subsections of Colo. Rev. Stat. § 18-17-106:

(1) Any district court may, after making due provision for the rights of innocent persons, enjoin violations of the provisions of section 18-17-104 by issuing appropriate orders and judgments, including, but not limited to:

    (a) Ordering any defendant to divest himself of any interest in any enterprise, including real property;

(continued...)

Though the parties don't address this potential problem, it's unclear whether we can ignore it. In our adversarial system we don't usually go looking for trouble but rely instead on the parties to identify the issues we must decide. At the same time, of course, this court has an affirmative obligation to admit when we or the district court lack the jurisdiction, or power, to hear a case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). And it's at least possible this problem bears a jurisdictional cast. To be sure, the "jurisdiction" epithet has been used too casually by too many courts in the past and it bears "many, too many, meanings." *Id.* at 90 (internal quotation marks omitted). But when talking about the absence of any inherent authority permitting a district court to issue a preliminary injunctive relief freezing a defendant's assets worldwide, *Grupo Mexicano* spoke of the problem as one of power and authority, tying its discussion to the grant of equity jurisdiction found in the Judiciary Act of 1789. When addressing cases

---

[1](...continued)

> (b) Imposing reasonable restrictions upon the future activities or investments of any defendant . . . ;
>
> [other forms of equitable relief].

(6) Any aggrieved person may institute a proceeding under subsection (1) of this section. In such proceeding, . . . . a temporary restraining order and a preliminary injunction may be issued in any such action before a final determination on the merits.

(7) Any person injured by reason of any violation of the provisions of section 18-17-104 shall have a cause of action for threefold the actual damages sustained. . . .

arising under the diversity statute, we've seen the Supreme Court has likewise suggested that diversity authority doesn't necessarily endow federal district courts the power or authority to issue every form of equitable relief a state court might possess in the same situation. *Guaranty Trust*, 326 U.S. at 105. Whether, given all this, the potential absence of an equitable remedy under state law qualifies as a "jurisdictional" limit on a federal court sitting in diversity, or suggests only a potential error in the application of state law, poses at least a lively question.

While we would normally pursue the question to its end and decide definitively whether we have a true jurisdictional problem knocking about here, we discern another and easier avenue to resolve this appeal. Even assuming a preliminary injunction is available in a COCCA action seeking only damages, Mr. Lasshofer and the corporate defendants argue another problem still bars the plaintiffs' way. As a matter of state law, they say, the plaintiffs have failed to demonstrate statutory standing to pursue *any* COCCA claim. And without the right to pursue *any* COCCA claim, it follows that the preliminary injunction must be withdrawn. This argument has the virtue of being fully briefed, easily resolved, and right. It has another virtue too. Because both this more modest state statutory standing question and any possible "jurisdictional" problem concerning the limits of the district court's authority to issue injunctive relief in this case amount to "threshold grounds" for resolving this appeal short of reaching its merits, we possess "leeway to choose among" them and to "take[] the less burdensome course." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431, 436 (2007). We think it prudent to do

just that in this case to avoid needlessly making a truly mammoth appeal out of one already large and tangled enough.

\* \* \*

The statutory standing question is (relatively) easily resolved and dispositive for a reason we alluded to some time ago. It was Mesatex that sought the loan, signed the loan application, and received the loan commitment. It was Mesatex's subsidiaries that signed the loan agreement and its amendment, paid the loan fees, and advanced the loan collateral. It was those companies, too, that owned the Breckenridge properties and whose business allegedly suffered when the loan failed to materialize. Yet neither Mesatex nor any of its subsidiaries is named as a plaintiff in this lawsuit. Mr. Niemi and his colleagues stress that they invested in Mesatex and its subsidiaries; they stress, too, that they guaranteed some of the corporations' loans. But it's long settled law that a shareholder or guarantor lacks standing to assert RICO claims when their losses are only derivative of a corporation's — when the individuals' losses come about only because of the firm's loss. Every circuit to have addressed the question — including this one in *Bixler v. Foster*, 596 F.3d 751, 758-59 (10th Cir. 2010) — has held that the proper plaintiff in these situations is the corporation, not the investor or guarantor. *See Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 640-41 (9th Cir. 1988) (collecting cases). We know, too, that Colorado courts interpreting COCCA look to federal RICO law for guidance. *See Floyd v. Coors Brewing Co.*, 952 P.2d 797, 803 (Colo. App. 1997), *rev'd on other grounds sub nom. Coors Brewing Co. v. Floyd*, 978 P.2d 663 (Colo. 1999). So taking all this together it

seems pretty plain the plaintiffs lack standing to proceed under COCCA, let alone to win a preliminary injunction under COCCA. After all, "in addition to the Article III standing requirements, [p]laintiffs must also meet the statutory standing requirements" of the statute under which they seek relief. *Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998); *see also id.* at 1216 (analyzing statutory standing under the APA); *Kansas v. United States*, 249 F.3d 1213, 1221-23 (10th Cir. 2001).

Admittedly, few rules lack exceptions and the statutory standing rule we've just identified certainly bears an important one we must pause to consider. A plaintiff who can identify some way in which he or she suffered personally and directly as a result of the defendant's conduct — some way in which his or her losses are not derivative of the corporation's losses — can proceed with or without the corporation in the case. *See generally Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990). So, for example, when a plaintiff can claim that the defendant's actions not only hurt the corporation but prevented her personally from practicing her trade or profession, that can be enough to allow a suit to proceed with her as plaintiff. *See Heart of Am. Grain Inspection Servs., Inc. v. Missouri Dep't of Agric.*, 123 F.3d 1098, 1102 (8th Cir. 1997); *Cooper v. McBeath*, 11 F.3d 547, 551 (5th Cir. 1994); *see also Hobby Lobby*, ___ F.3d ___, 2013 WL 3216103, at *34 (10th Cir. 2013) (en banc) (Gorsuch, J., concurring).

The problem we face is this. Despite being challenged to do so in this appeal, the plaintiffs have not identified in their brief any direct and personal injury they suffered. Mr. Niemi points out that he signed the loan agreement with Mr. Burgess and that he

wired the funds required by the loan agreement. But he admits he signed the loan agreement and other documents only in his capacity as a manager of Mesatex or its subsidiaries. *See, e.g.*, Loan Agreement at 81, Exh. 17 to Mot. for Temporary Restraining Order & Preliminary Injunction, No. 12-CV-869-RBJ (D. Colo. Apr. 5, 2012), ECF No. 6. And signing a contract or performing actions on behalf of a corporation generally isn't enough to qualify as a direct and personal interest. *See Kaplan v. First Options of Chicago* (*In re Kaplan*), 143 F.3d 807, 812 (3d Cir. 1998). Likewise, Mr. Niemi never disputes that he and his colleagues sent money to the defendants only in their roles as Mesatex's creditors to satisfy Mesatex's contractual duties to the defendants — and they develop no argument and cite no authority suggesting this was enough to establish a direct and personal loss of their own. *See Am. Capital Corp. v. FDIC*, 472 F.3d 859, 866-67 (Fed. Cir. 2006). We are thus left without any convincing explanation how the losses the individual plaintiffs suffered in this case arose from anything other than their participation as investors, creditors, and guarantors of the injured corporation.

Without proof of a direct and personal injury, the plaintiffs try to save the preliminary injunction with a very different line of attack. They assert that Mesatex assigned its claims to them or that they otherwise succeeded to the company's interests when it became defunct. But everyone acknowledges that standing to pursue a claim must normally exist by the time a lawsuit is filed. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000); *Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006). And though the record before us on appeal suggests an

assignment took place *sometime*, it doesn't tell us *when* — let alone offer assurance that the assignment took place *before* this lawsuit began. Neither does the record on appeal show that Mesatex or its subsidiaries ever dissolved, let alone that they dissolved and the plaintiffs somehow succeeded to their claims *before* this lawsuit started. The burden of proving statutory standing rests on the plaintiffs' shoulders and, try as we might, we see no way we can faithfully hold that they carried that burden in their appellate briefs and the record they assembled for this appeal.

*   *   *

Even so, that isn't quite the end of the story. After briefing and oral argument and while this case was under submission, the plaintiffs graced us with no fewer than five Rule 28(j) letters. *See* Fed. R. App. P. 28(j). In these letters, the plaintiffs have sought to inject new issues and theories into this appeal. Among other things, they now contend for the first time that the defendants forfeited their statutory standing complaint by failing to raise the issue in district court. Not to be outdone, the defendants have replied in kind, with five letters of their own, insisting (again, among many other things) that they did present the statutory standing issue in district court.

We decline to resolve the parties' collateral appeal by correspondence. In their opening appellate brief, the defendants contested the plaintiffs' statutory standing. In their responsive appellate brief, the plaintiffs chose to meet the defendants' statutory standing challenge head on, asking us to affirm their standing outright, forgoing any suggestion that the defendants forfeited the issue in district court. Only after we voiced interest in the

- 21 -

statutory standing issue at oral argument did the plaintiffs apparently worry about the need for a backup argument and try to introduce the forfeiture question by way of a letter to the court. This tactical shift comes far too late in the day. While we will consider jurisdictional problems whenever they appear, we generally refuse to consider any other new issue introduced for the first time in a reply brief, let alone in a Rule 28(j) letter. *See Hill v. Kemp*, 478 F.3d 1236, 1250-51 (10th Cir. 2007); *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994) (White, J., sitting by designation).

The proper function of Rule 28(j) letters, after all, is to advise the court of "new authorities" a party has learned of after oral argument, not to interject a long available but previously unmentioned issue for decision. *See* Fed. R. App. P. 28(j). Allowing a party to convert the rule to an entirely new and different purpose — allowing Rule 28(j) letters to be used to introduce any sort of new issue after briefing is complete — risks leaving opponents with no opportunity (at least if they abide the rules of appellate procedure) for a proper response; it risks an improvident opinion from this court by tasking us with the job of issuing an opinion without the full benefits of the adversarial process; and it invites an unsavory degree of tactical sandbagging by litigants in future cases: why bother pursuing a potentially winning issue at the outset when you can wait to introduce it at the last second and leave your opponent without the chance to respond? *See Hill*, 478 F.3d at 1250-51; *Headrick*, 24 F.3d at 1277-78.

This is not to suggest that we cannot take notice on our own of a forfeiture not timely raised by the opposing party, only that nothing *compels* that course in this case.

Yet, even if we did so here — even if we found the statutory standing question forfeited and so reviewed it only under a plain error standard — we would reach the same result. Plain error is "(i) error, (ii) that is plain, which (iii) affects substantial rights, and which (iv) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2010). The absence of evidence in the record on appeal establishing a pre-lawsuit assignment or some direct and personal injury is plain enough. Neither do we doubt that an order freezing all of a defendant's worldy assets affects his substantial rights. And affording such sweeping relief based on a claim that belongs only to parties who are not even before the court cannot help but seriously affect the fairness of the proceedings.

Besides pressing forfeiture for the first time, the plaintiffs use Rule 28(j) letters to say even more about statutory standing. They assert that, since oral argument in this appeal, the district court has addressed the issue further and in doing so resolved any worry we might have. But even assuming the district court had the power to address the statutory standing question while it was pending in this court — *see Colorado v. Idarado Min. Co.*, 916 F.2d 1486, 1490 n.2 (10th Cir. 1990) — the transcript the plaintiffs provide from the district court proceeding does not resolve this appeal. To be sure, the transcript discusses how Mr. Niemi and his partners advanced the $2.18 million to the defendants on behalf of Mesatex. But it does not discuss *Bixler* or examine how the individual plaintiffs' payment on behalf of and in the name of Mesatex and its affiliated companies might avoid *Bixler*. Neither does the transcript reveal when Mesatex's interests might have been

transferred to the individual plaintiffs, or clearly hold that they have established a direct and personal injury as required by *Bixler*.

This isn't to suggest the statutory standing problem is insurmountable — or even close to it. Though standing isn't apparent in the transcript the plaintiffs recently supplied or the record they prepared for our review on appeal, perhaps on remand the plaintiffs can muster credible evidence that an assignment occurred before the lawsuit began. Perhaps they can persuade the district court to add Mesatex and the other corporations to the suit. Perhaps they can establish some direct and personal injury. Some other possible factual or legal angle might appear. But at this point — on the arguments before us and with the record on appeal supplied to us — we see no way we might lawfully avoid the conclusion that the plaintiffs have not established statutory standing under COCCA.

\* \* \*

We take no joy in having to undo the district court's work in this case. As this appeal illustrates (and only illustrates — representing just a small window into the case), this litigation has already proven a long and arduous journey with the parties avidly clawing for every inch tooth and nail. It pleases us not at all to add to the delay and cost of this litigation or to the district court's plate — and to do so in a case that, we must add, the district court has managed with extraordinary diligence, rectitude, and care. But we take cases as they come to us, and on the briefs and record that come to us in this one, the law demands that we recognize the absence of statutory standing. For this court in this appeal, if not for the district court on remand, that has to mark the end of the road. The June 2012

- 24 -

preliminary injunction is vacated and the case is remanded for further proceedings consistent with this opinion.