**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN NIEMI; ROBERT NAEGELE, III;
JESPER PARNEVIK,

     Plaintiffs - Appellees,

v.

ERWIN LASSHOFER; INNOVATIS
GMBH; INNOVATIS IMMOBILIEN
GMBH; INNOVATIS ASSET
MANAGEMENT SA,

     Defendants - Appellants,

and

MICHAEL FRANK BURGESS;
LEXINGTON CAPITAL & PROPERTY
INVESTMENTS, LLC; BARRY FUNT;
CREDIT SUISSE AG,

     Defendants.

No. 13-1256

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:12-CV-00869-RBJ)**

---

Kevin D. Evans (Phillip L. Douglass with him on the briefs), Steese, Evans & Frankel,
P.C., Denver, Colorado, for the Defendants - Appellants.

Michael Lee Bender (Robert N. Miller and Michael A. Sink, Perkins Coie LLP; Denver, Colorado, and Christopher W. Madel, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, Minnesota, on the briefs), Perkins Coie LLP, Denver, Colorado, for the Plaintiffs - Appellees.

---

Before **LUCERO**, **O'BRIEN**, and **GORSUCH**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

John Niemi, Robert Naegele, III, and Jesper Parnevik ("Plaintiffs" or "Appellees") claim that Erwin Lasshofer and three companies affiliated with him (the "Lasshofer Defendants" or "Appellants"), along with other co-conspirators, perpetrated a fraudulent financing scheme that caused the collapse of Plaintiffs' large-scale real estate development project in Breckenridge, Colorado. The district court rejected the Lasshofer Defendants' challenges to standing, jurisdiction, and venue, and entered a default judgment of approximately $185 million in favor of Plaintiffs. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's judgments with two exceptions. We reverse as to personal jurisdiction over Innovatis Immobilien GmbH. We also remand to the district court with instructions to vacate its contempt order.

**I**

**A**

According to the Amended Complaint, Niemi began working with Fairmont Hotels and Resorts on a large-scale development project in Breckenridge, Colorado in

2006.[1]  The project, which became known as the Fairmont Breckenridge, was a joint

venture between Niemi, Naegele, and Parnevik, with Niemi acting as agent for the group.

Niemi testified that a combination of debt and equity was used to purchase properties for

the three primary components of the project, known as the Fairmont Shock Hill, Fairmont

Residences on the River, and Fairmont River Lodge.  Niemi also testified that Azco LLC

and Azco II LLC (the "Azco entities") were the purchasers of these properties, and that

the Azco entities rolled up into Mesatex LLC, of which he was the managing member.

Based on the success of Phase I of the project, Niemi sought $200-220 million in

funding to pay off Phase I loans and complete the project in Phase II.  He initially

engaged in discussions with various potential financers.  Defendants Lasshofer and

Michael Burgess represented that their companies could secure the full amount needed

for Phase II, but required Niemi to sign an agreement prohibiting him from seeking other

funding before the due diligence process could begin.  In September 2009, Niemi

authorized a formal loan request.  This document required that a $180,000 loan

commitment fee be paid to Burgess' company, Prosperity International LLC

("Prosperity"), and contained a confidentiality clause prohibiting Niemi from discussing

the project with other potential lenders.  After Prosperity issued a Commitment Letter,

Niemi wired Prosperity the loan commitment fee.  Negotiations regarding the potential

---

[1] Because the district court granted default judgment to the Plaintiffs following the
Lasshofer Defendants' failure to file an answer to their complaint, we take the facts from
the operative complaint (filed July 24, 2012) unless otherwise noted.

loan took place via numerous emails, phone calls, and meetings. Following an extensive due diligence process, a Loan Agreement was executed on December 7, 2009. Plaintiffs provided a $2 million "upfront collateral deposit."

The promised loan proceeds never materialized. The defendants "engaged in an elaborate scheme to defraud Plaintiffs out of millions of dollars" by promising to fund the loan for Phase II without any intention of doing so, resulting in the collapse of the Fairmont Breckenridge project. During the first half of 2010, "Burgess sent dozens of emails explaining why loan proceeds would not be delivered as scheduled and promising their imminent release. Burgess repeatedly represented in these emails that he spoke for himself and for Lasshofer and/or that he was passing on information" from Lasshofer. In February 2010, Niemi traveled to Europe with Burgess to meet with Lasshofer and attempt to resolve any barriers to financing. At the meeting, Lasshofer and Burgess acknowledged the hardship caused by the delayed funding, and Lasshofer assured Niemi that funding would begin within five weeks. On March 9, 2010, the parties entered a Loan Modification Agreement which called for loan payments to begin later that month. The Amended Complaint also describes several documents sent to Niemi to assure Plaintiffs that the loan would be funded, including a Joint Venture Agreement ("JVA") between Lasshofer and Burgess indicating that they were working to fund the Fairmont Breckenridge and memoranda signed by Lasshofer authorizing transfers of loan funds.

In June 2010, Burgess was indicted in the U.S. District Court for the Middle District of Florida in connection with frauds related to the Fairmont Breckenridge and

-4-

other projects. He pled guilty to conspiracy to commit wire fraud and money laundering and was sentenced to 180 months' imprisonment. The court ordered Burgess to pay over $94 million in restitution, including $45,990,300 designated to Niemi. According to the Amended Complaint, Burgess admitted as part of his plea agreement that wire fraud proceeds were deposited in an account belonging to defendant Innovatis Asset Management, SA ("IAM")—a company associated with Lasshofer, implicated Lasshofer as his co-conspirator, and stated that IAM was continuing to defraud investors. Even after Burgess' arrest, Lasshofer continued to reassure Plaintiffs that the loan would be funded. No funds were ever disbursed.

According to sworn declarations by the three plaintiffs, they held a conversation on August 2, 2010 to discuss how to recover from the fraud. During the conversation, Niemi, acting on behalf of the Azco entities and Mesatex, expressly assigned all causes of action and claims belonging to those companies to Parnevik, Naegele, and himself. During a preliminary injunction hearing, Niemi testified that Plaintiffs had "acceded" to any claims possessed by these companies.[2] Following that hearing, in July 2012, Plaintiffs signed a written Assignment Agreement memorializing the prior oral assignment.

**B**

In April 2012, Plaintiffs filed a Verified Complaint commencing the underlying

---

[2] Plaintiffs assert that in the written record of the hearing, "succeeded" was erroneously transcribed as "acceded."

-5-

lawsuit against Burgess, the Lasshofer Defendants, and others, in the U.S. District Court for the District of Colorado. The complaint explains the various defendants' identities and relationships. Lasshofer, a domiciliary of Austria, is described as the managing director and sole beneficial owner of defendants Innovatis GmbH and Innovatis Immobilien GmbH, which are registered in Austria, as well as a co-founder and board member of defendant IAM, a Panamanian company. The three companies are members of the Innovatis Group, "a collection of affiliated entities from around the world purporting to provide asset management and consulting services." Burgess was the manager of Prosperity, a now-dissolved Florida company that claimed to engage in real estate development and project financing. Burgess was also the secretary of Innovatis, Inc., and Lasshofer was its president, before that company's dissolution. Defendant Lexington Capital & Property Investments, LLC, represented itself as Prosperity's exclusive underwriter. Defendant Barry Funt, through a now-defunct corporation called Essex Investment Partners, LLC, purported to work as a loan administrator and escrow agent for Prosperity.[3]

The July 2012 Amended Complaint alleged seventeen claims for relief, including, as relevant to this appeal, a claim under the Colorado Organized Crime Control Act ("COCCA") against the Lasshofer Defendants (Claim 5) and a common law fraud claim against all defendants (Claim 12). We recount below the pertinent portions

---

[3] Credit Suisse was added to the suit as a nominal defendant, but its involvement is not at issue in this appeal.

of the case's extensive procedural history.

After granting Plaintiffs' motion for an ex parte temporary restraining order ("TRO") to guard against dissipation of the Lasshofer Defendants' assets, the district court held a preliminary injunction hearing on March 25, 2012. At the hearing, the court found that it possessed personal jurisdiction over the Lasshofer Defendants and that venue was proper in the District of Colorado. In a written order issued June 1, 2012, granting a preliminary injunction, the district court reiterated its rulings on personal jurisdiction and venue. The order effectively froze the worldwide assets of the Lasshofer Defendants (with exceptions for business expenses) and ordered them to deposit $2.18 million in escrow in Colorado pending a final judgment. On September 6, 2013, this Court vacated the preliminary injunction on the ground that Plaintiffs had not established statutory standing under COCCA, upon which the injunction was based, and remanded the matter to the district court. Niemi v. Lasshofer, 728 F.3d 1252, 1257-58, 1263 (10th Cir. 2013) ("Niemi I").

While the interlocutory appeal of the preliminary injunction was pending, the district court ruled on several motions, asserting authority to do so under Colorado v. Idarado Mining Co., 916 F.2d 1486, 1490 (10th Cir. 1990). On June 15, 2012, the Lasshofer Defendants filed a Fed. R. Civ. P. 12(b) motion to dismiss, asserting improper

service of process, lack of personal jurisdiction, and improper venue.[4] At a hearing on March 8, 2013, the district court denied a motion for default judgment filed by Plaintiffs because the Lasshofer Defendants had filed a motion to dismiss. The court then denied that motion to dismiss and ordered the Lasshofer Defendants to respond to the complaint or face default judgment. It also ordered the Lasshofer Defendants to show cause why they should not be held in contempt for failure to obey the TRO and preliminary injunction.

On March 15, 2013, the Lasshofer Defendants filed a Rule 12(h)(3) motion to dismiss for lack of standing and subject-matter jurisdiction.[5] Following a hearing on March 26, 2013, the district court found the Lasshofer Defendants to be in contempt of its June 1, 2012, preliminary injunction order. It also denied their second motion to dismiss, along with Plaintiffs' motion for summary judgment. Shortly thereafter, the Plaintiffs and the Lasshofer Defendants made a joint submission to the court in which the Lasshofer Defendants declared that they would "not devote any more resources to this lawsuit at the District Court level," and that they would neither "be filing an answer to Plaintiff's Amended Complaint [nor] participating in discovery."

---

[4] The Lasshofer Defendants also vigorously challenged the district court's grant of Plaintiffs' ex parte motion for service abroad, but do not pursue their challenge to service of process on appeal.

[5] In an emergency motion to stay the June 1, 2012, preliminary injunction, the Lasshofer Defendants briefly argued that Plaintiffs failed to demonstrate standing, but they did not assert this argument in their first motion to dismiss. Both the district court and this court denied a stay.

Based on its contempt finding, the district court ordered the Lasshofer Defendants to pay $10,000 per day in sanctions (to continue until they placed $2.18 million in an escrow account in Colorado). It later issued a bench warrant for Lasshofer's arrest. Because they stated that they would not answer the complaint or otherwise participate in the case at the district court level, the district court entered default judgment against the Lasshofer Defendants.

On June 7, 2013, the district court conducted a hearing to determine damages. Niemi testified and presented a report (the "Niemi Report"). The Lasshofer Defendants called a licensed appraiser who contested the Niemi Report. On June 11, 2013, the court issued a default judgment in favor of Plaintiffs against the Lasshofer Defendants in the amount of $61,692,492. The default judgment order specified that Claims 5 and 12, against the Lasshofer Defendants, were severed pursuant to Fed. R. Civ. P. 54(b).

On July 17, 2013, the Lasshofer Defendants filed a notice of appeal. Because the order they sought to appeal did not appear to dispose of all claims against all parties or to provide sufficient analysis for a final appealable judgment under Fed. R. Civ. P. 54(b), and because several motions filed by Plaintiffs remained outstanding (including their motions to treble damages and for Rule 54(b) certification), this court tolled the appeal. On August 23, 2013, the district court issued a written final judgment as to Claims 5 and 12 against the Lasshofer Defendants. In its order granting final judgment as to these claims, the court reiterated that it found no just reason for delay. It also noted its view that despite the complaint's "assert[ion of] more claims . . . and nam[ing of] more

defendants than what might be necessary . . . this lawsuit has been pursued as the three plaintiffs' attempt to establish what amount to statutory and common law fraud claims against Mr. Lasshofer and his entities." The final judgment trebled the $61,692,492 awarded on the COCCA claim (Claim 5) to $185,077,476, explaining that Plaintiffs could collect up to that amount on the COCCA claim and up to $61,692,492 on the common-law fraud claim (Claim 12) but not more than $185,077,476 total.

## II

Before reaching the issues raised by Appellants, we must resolve several arguments challenging our authority to consider this appeal at this time. We conclude that the appeal is ripe, that the fugitive disentitlement doctrine does not mandate dismissal, and that Appellants are not required to post a bond.

## A

This court's order tolling the appeal directed the parties to brief the issue of our appellate jurisdiction. In briefing submitted before the district court issued its August 23, 2012, written judgment, the Lasshofer Defendants argued that the district court had failed to comply with Rule 54(b). Because we remained concerned, even after lifting the abatement of this appeal, that the claims certified under Rule 54(b) in the district court's August 23, 2012, order were not separable from Plaintiffs' remaining unadjudicated claims, we issued an order directing Appellants to "file in this court a copy of an order of the district court dismissing the remaining claims with prejudice" or face dismissal of the appeal.

-10-

"When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). We review the district court's determination of finality de novo and its determination that there is no reason for delay for abuse of discretion. Okla. Tpk. Auth. v. Bruner, 259 F.3d 1236, 1242 (10th Cir. 2001). In Oklahoma Turnpike Authority, we held that Rule 54(b) certification is appropriate only if the district court determines "that the order it is certifying is a final order" and "that there is no just reason to delay review of the final order until it has conclusively ruled on all claims presented by the parties to the case." 259 F.3d at 1242 (citations omitted). "[A] judgment is not final for the purposes of Rule 54(b) unless the claims resolved are distinct and separable from the claims left unresolved." Id. at 1243.

Pursuant to our order, Appellants filed with this court, on August 29, 2014, a copy of the district court's order dismissing all remaining claims with prejudice. A dismissal of all claims with prejudice, even if voluntarily sought by the party who initiated the suit, is final for purposes of appellate jurisdiction, making Rule 54(b) certification unnecessary. Martin v. Franklin Capital Corp., 251 F.3d 1284, 1288 (10th Cir. 2001). Because there are no remaining unadjudicated claims, the appeal is now ripe.

**B**

Plaintiffs ask us to employ the "fugitive disentitlement doctrine" to dismiss the

-11-

Lasshofer Defendants' appeal based on their refusal to comply with the district court's orders. Under this doctrine, "an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal." Ortega-Rodriguez v. United States, 507 U.S. 234, 239 (1993). Among the justifications for such a dismissal are concerns regarding the enforceability of the appellate court's judgment and "a 'disentitlement' theory that construes a defendant's flight during the pendency of his appeal as tantamount to waiver or abandonment." Id. at 240.

Plaintiffs raised a nearly identical argument in Niemi I. 728 F.3d at 1255-57. We rejected Plaintiffs' position in that case, concluding that they "argue[d] less for an application of the fugitive disentitlement doctrine than for a serious extension of it. They want us to disentitle not a criminal in hiding, but a civil litigant who has chosen to sit defiantly at home. That is quite a leap." Id. at 1256. Plaintiffs essentially reiterate the argument that failed to persuade the Niemi I panel that we had already taken this leap, and we remain disinclined to "extend into mainstream civil litigation a doctrine rooted in crime." Id.

We discern no change in circumstances since Niemi I that would favor applying the fugitive disentitlement doctrine. To the contrary, this court's order vacating the preliminary injunction means the contempt order and bench warrant stemming from it— the primary bases of Plaintiff's argument that Appellants are fugitives of the court's

authority—must be vacated as well.[6]  See Reliance Ins. Co. v. Mast Constr. Co., 84 F.3d 372, 376 (10th Cir. 1996) ("[A] claim for civil contempt must fall if the order that was disobeyed is subsequently reversed by . . . the appellate court.").  Plaintiffs' assertion that Lasshofer is the target of criminal proceedings in Austria is unavailing because, assuming arguendo that this is true, the fugitive disentitlement doctrine has been understood to bar appeals to the same court system that the fugitive is evading.  See Martin v. Mukasey, 517 F.3d 1201, 1205 (10th Cir. 2008) (fugitive disentitlement doctrine intended to prevent an appellant from "us[ing] the judicial system while at the same time avoiding it" (quotation omitted)).  And we decline to consider Plaintiffs' argument that the Lasshofer Defendants have admitted criminal involvement in the wire fraud conspiracy to which Burgess pled guilty because it is first advanced in Plaintiffs' reply.  See Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue.").

Although we are sympathetic to Plaintiffs' arguments that Appellants have demonstrated a general disregard for the authority of the district court, we are unwilling to impose the drastic remedy of barring their appeal.  We deny the motion to dismiss based on the fugitive disentitlement doctrine.  We decline, however, to award costs and fees to the Appellants because they have, like the Appellees, been responsible for

---

[6] This holding should not be understood as affecting the district court's inherent power to enforce the judgments we affirm on appeal.  See Peacock v. Thomas, 516 U.S. 349, 356 (1996).

-13-

numerous ancillary motions and other pleadings in this appeal.[7]

**C**

Plaintiffs also argue that Appellants must either post a bond in the amount of the default judgment or obtain a stay before proceeding on appeal. They rely solely on one sentence plucked from the Niemi I decision: "After a final judgment, too, an absent civil defendant cannot appeal without either posting a bond or coming to court and winning a stay." 728 F.3d at 1256.

We agree with Appellants that imposing the conditions Plaintiffs seek would be sharply at odds with recognized rules of procedure. The Federal Rules of Appellate Procedure permit a party to appeal by filing of a notice of appeal. See Fed. R. App. P. 3(a)(1) ("An appeal permitted by law as of right from a district court to a court of appeals may be taken only by filing a notice of appeal with the district clerk within the time allowed."). And language from the Federal Rules of Civil Procedure cited by the Niemi I panel in support of the sentence highlighted by the movants provides that "[i]f an appeal is taken, the appellant may obtain a stay by supersedeas bond." Fed. R. Civ. P. 62(d) (emphasis added). This rule is permissive rather than mandatory, and it is intended to protect an appellant from execution of an adverse judgment during an appeal, as well as

---

[7] We also reject Appellants' vague contention that the filing of the motion to dismiss is subject to sanctions. Additionally, because Appellants moved for leave to file a surreply in order to respond to an argument that both parties briefed in full in connection with Plaintiffs' second motion regarding the appeal, discussed below, we deny the motion to file a surreply as moot.

to provide assurance to the appellee if thus prevented from collecting on the judgment. See, e.g., Strong v. Laubach, 443 F.3d 1297, 1300 (10th Cir. 2006) ("Because [the defendant-appellant] did not seek a stay pending appeal, however, the [plaintiff-appellee] did not need the protection of a supersedeas bond."). The Niemi I panel gave no indication that it intended to drastically alter these established rules.

We therefore deny the motion to require a stay or bond, and again decline Appellants' request for an award of costs and fees related to the motions practice on this issue. Concluding that Appellants have fulfilled the requirements for seeking our review, we proceed to the issues on appeal.

## III

Given the focus of the Lasshofer Defendants' previous efforts to defeat this lawsuit, it is unsurprising that they pursue several challenges to the district court's authority to hear and rule upon the case. They contend that: (1) Plaintiffs did not have standing to bring their claims, and the district court thus lacked subject-matter jurisdiction; (2) the court did not have personal jurisdiction over the Lasshofer Defendants; and (3) venue did not properly lie in the District of Colorado.

## A

Appellants contend that Plaintiffs lacked prudential standing to bring their claims, and that the absence of standing deprived the court of subject matter jurisdiction. The district court disagreed on both counts. We review a district court's determination regarding subject-matter jurisdiction de novo. Dahl v. Charles F. Dahl, M.D., P.C.

-15-

Defined Benefit Pension Trust, 744 F.3d 623, 628 (10th Cir. 2014); see also Marcus Food

Co. v. DiPanfilo, 671 F.3d 1159, 1171 (10th Cir. 2011) (reviewing de novo district

court's determination that it had subject-matter jurisdiction and could therefore enter

default judgment). We also review the district court's rulings on standing de novo. Nova

Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005).

**1**

Fundamentally, Appellants argue that the Plaintiffs lack prudential standing as

individuals because, although their suit is based on Appellants' violation of the Loan

Agreement, Plaintiffs are not parties to that contract. The Loan Agreement lists the Azco

entities collectively as the Borrower, Prosperity as the Lender, and IAM as the

Beneficiary. Niemi signed the document as "Managing Member" on behalf of the Azco

entities, and Mesatex is identified as the Borrower Representative. As this court held in

Niemi I, "Colorado courts interpreting COCCA look to federal [Racketeer Influenced and

Corrupt Organizations Act ("RICO")] law for guidance" and "a shareholder or guarantor

lacks standing to assert RICO claims when their losses are only derivative of a

corporation's." 728 F.3d at 1260 (citing Bixler v. Foster, 596 F.3d 751, 758-59 (10th Cir.

2010)). Appellants assert that subject-matter jurisdiction cannot exist if prudential

standing is defeated, and thus all decisions made by the district court are void.

We note that the Supreme Court in Lexmark International, Inc. v. Static Control

Components, Inc., 134 S. Ct. 1377 (2014), recently clarified the nomenclature of

concepts generally encompassed in the term "prudential standing." Id. at 1386-88. In

addition to the well-known constitutional requirements of Article III standing, the Court acknowledged that it has defined prudential standing to include "at least three broad principles: the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Id. at 1386 (quotation omitted). But the Court clarified that the question of whether a party "falls within the class of plaintiffs whom Congress has authorized to sue" under a particular statute is not one properly labeled as "prudential"; rather, it is a question of statutory interpretation. Id. at 1387-88. The Court pointed specifically to Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), which examined who could bring a cause of action under RICO, as a case involving statutory interpretation rather than prudential considerations. Id. at 1386-87. Although the standing argument advanced by Appellants may no longer be properly labeled "prudential," we affirm that it is meritless.

In keeping with the procedural history of this case, the chronicle of Appellants' challenge to standing and subject-matter jurisdiction is complex. Although the Lasshofer Defendants asked Niemi some questions related to standing at the preliminary injunction hearing, they did not raise a standing argument at that stage in the proceedings. Appellants first argued—in a single paragraph citing no authority—that Plaintiffs failed to demonstrate standing in their emergency motion to stay the district court's preliminary injunction order pending appeal. Both the district court and this court summarily denied

-17-

the requested stay. In June 2012, Appellants filed a Rule 12(b) motion, later denied by the district court, which did not address standing or subject-matter jurisdiction. It was not until March 15, 2013, that the Lasshofer Defendants raised those issues in a document styled as a Rule 12(h)(3) motion to dismiss. At its hearing on March 26, 2013, the district court noted that it did not have the opportunity to consider standing before granting the preliminary injunction, but that the issue had been briefed by the Lasshofer Defendants in their pending appeal of the preliminary injunction. The district court subsequently denied the motion to dismiss.

On September 6, 2013, this court vacated the district court's preliminary injunction on the ground that Plaintiffs lacked statutory standing. Niemi I, 728 F.3d at 1260-63. The Niemi I panel held that Plaintiffs failed to show "any direct and personal injury they suffered," and did not present evidence sufficient to convince the court that an assignment of the claims they asserted was timely made. Id. at 1261. But the court issued a pointed proviso:

> This isn't to suggest the statutory standing problem is insurmountable—or even close to it. Though standing isn't apparent in the transcript the plaintiffs recently supplied or the record they prepared for our review on appeal, perhaps on remand the plaintiffs can muster credible evidence that an assignment occurred before the lawsuit began. . . . Perhaps they can establish some direct and personal injury. Some other possible factual or legal angle might appear.

Id. at 1263. In their second appeal to this court, Plaintiffs have overcome the burden they failed to surmount in Niemi I.

We first consider Plaintiffs' argument that the Lasshofer Defendants' standing

-18-

challenge was not timely raised below and is therefore waived.  Appellants are correct

that the question of subject-matter jurisdiction can be raised at any time.  See, e.g.,

Huffman v. Saul Holdings Ltd. P'ship, 194 F.3d 1072, 1076-77 (10th Cir. 1999) ("A

defect in subject matter jurisdiction can never be waived and may be raised at any

time.").  But they are incorrect when they contend that lack of standing implicates

subject-matter jurisdiction.  Although the jurisprudence surrounding standing and

jurisdiction has at times been muddled, we have clearly held that "prudential standing is

not a jurisdictional limitation and may be waived."  Wilderness Soc. v. Kane Cnty., 632

F.3d 1162, 1168 n.1 (10th Cir. 2011) (en banc).  And the Supreme Court has affirmed

that questions of so-called "statutory standing" like the one presented in this case, despite

no longer falling under the technical label of prudential standing, are not jurisdictional:

"the absence of a valid (as opposed to arguable) cause of action does not implicate

subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate

the case."  Lexmark, 134 S. Ct. at 1387 n.4 (quotation omitted).

The Niemi I panel expressly declined to decide whether the standing issue was

forfeited because the forfeiture argument was first presented to that panel via Fed. R.

App. P. 28(j) letters, after briefing and oral argument.  728 F.3d at 1261-62.  However,

the forfeiture issue is clearly presented to us in the instant appeal.

The Lasshofer Defendants did not advance their standing contention before the

district court until their emergency motion to stay the preliminary injunction, leading the

district court to remark that it did not have the proper opportunity to consider the

-19-

argument before it was taken up on appeal in Niemi I. When the Lasshofer Defendants filed their first Rule 12 motion to dismiss, they argued improper service of process, lack of personal jurisdiction, and improper venue, but declined to include the standing issue. Their second motion to dismiss, which did challenge Plaintiffs' standing, was therefore improper under Rule 12(g)(2). See Fed. R. Civ. P. 12(g) (with limited exceptions, "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion"). The Lasshofer Defendants attempted to frame their motion as one brought under Rule 12(h)(3) for lack of subject-matter jurisdiction, one of the limited exceptions to Rule 12(g)(2), but as we have explained, their statutory standing argument does not implicate subject-matter jurisdiction. Whereas "forfeiture comes about through neglect," waiver "requires a showing that a known right has been intentionally relinquish[ed] or abandon[ed]." United States v. McGehee, 672 F.3d 860, 873 (10th Cir. 2012) (quotations omitted). Although the Lasshofer Defendants asserted that Plaintiffs lacked standing in their emergency motion to stay the preliminary injunction (albeit in cursory fashion), thus demonstrating their awareness of the argument, they failed to include this issue in their first motion to dismiss.

Nonetheless, and contrary to Plaintiffs' contention on appeal, the district court chose to address and rule upon the standing issue. "It is a general rule that a federal appellate court will not consider an issue which was not presented to, considered or decided by the trial court," Cavic v. Pioneer Astro Indus., Inc., 825 F.2d 1421, 1425 (10th

Cir. 1987) (quotation omitted), but the standing challenge was ruled upon by the district court. Although the Lasshofer Defendants' second motion to dismiss was improperly presented to the district court in contravention of Rule 12(g)(2), we will review it because the district court chose to address the substance of the argument.

## 2

Appellants contend that Plaintiffs are not proper claimants because they are not parties to the Loan Agreement, and thus were only indirectly injured as stakeholders in the companies that signed the agreement. The prior panel explained that under Bixler, "a shareholder or guarantor lacks standing to assert RICO [or COCCA] claims when their losses are only derivative of a corporation's." Niemi I, 728 F.3d at 1260. But we elaborated that "[a] plaintiff who can identify some way in which he or she suffered personally and directly as a result of the defendant's conduct—some way in which his or her losses are not derivative of the corporation's losses—can proceed with or without the corporation in the case." Id.

The evidence presented to the district court after our consideration of the record in Niemi I satisfies us that Plaintiffs possess statutory standing based on the assignment of claims. Even if the Plaintiffs were not originally injured directly by the fraud, they have now provided sufficient evidence of a proper assignment of the relevant corporations' claims. In Niemi I, the panel found itself constrained to reject the assignment argument because "the record . . . suggest[ed] an assignment took place sometime," but did not indicate when, and thus the court could not be "assur[ed] that the assignment took place

-21-

before this lawsuit began." Id. at 1261. Plaintiffs have since provided sworn declarations affirming that the assignments were executed orally on August 2, 2010 (well before their lawsuit was filed in 2012), and provided an Assignment Agreement memorializing the prior oral assignments. At oral argument, Appellants conceded that the issue of the timing of the assignment was no longer contested.

This leaves Appellants with the argument that the Loan Agreement's non-assignment clause barred such a transfer of the right to sue. We agree with the district court that the Loan Agreement was but a tool of the defendant's broader fraudulent enterprise. The terms of of the Loan Agreement—including the non-assignment clause—are therefore void and unenforceable. Bennett v. Coors Brewing Co., 189 F.3d 1221, 1229 (10th Cir. 1999) ("Under general contract principles, it is well established that a contract is void and unenforceable if procured through fraud."). Claim 5, on which the district court entered judgment for Plaintiffs, stated that the defendants "wrongfully induc[ed]" Plaintiffs to enter a fraudulent loan agreement as part of their scheme.

Appellants suggest that Plaintiffs cannot simultaneously argue that the Loan Agreement is void and seek damages arising from the failure to lend, arguing that the damages request proves this is a contract case. But the fact that the Loan Agreement was used to further the fraudulent financing scheme upon which Plaintiffs premise their claim for damages does not bind Plaintiffs to the terms of the fraudulently obtained agreement. See Hoiles v. Alioto, 461 F.3d 1224, 1236-37 (10th Cir. 2006) (Colorado "allows benefit-of-the-bargain damages in an action for fraud"). We discuss the merits of Plaintiffs'

-22-

damages claim in more detail below.

**B**

Appellants also challenge the district court's determination that it had personal jurisdiction over them. "A default judgment in a civil case is void if there is no personal jurisdiction over the defendant." Hukill v. Okla. Native Am. Domestic Violence Coal., 542 F.3d 794, 797 (10th Cir. 2008) (quotations and alteration omitted). We review a district court's assertion of personal jurisdiction de novo. ClearOne Commc'ns, Inc. v. Bowers, 651 F.3d 1200, 1214 (10th Cir. 2011).[8]

If personal jurisdiction is evaluated by the district court based only on the complaint and affidavits, "a prima facie showing of personal jurisdiction" is sufficient. Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1070 (10th Cir. 2008). On the other hand, "when personal jurisdiction is assessed in an evidentiary hearing or at trial . . . the plaintiff generally must establish, by a preponderance of the evidence, that personal jurisdiction exists." Id. at 1070 n.4; see also Fed. Deposit Ins. Corp. v. Oaklawn Apartments, 959 F.2d 170, 174 (10th Cir. 1992). In its oral ruling on March 8, 2013, the district court said that "we . . . have to keep in mind that the Court construes plaintiffs' pleadings in their favor when considering personal jurisdiction. And that, too, supports

---

[8] Plaintiffs argue that the Lasshofer Defendants should be estopped from challenging personal jurisdiction because they refused to participate in discovery and consented to the district court's exercise of personal jurisdiction by appearing before the court and otherwise availing themselves of its authority. Because the district court declined to bar the Lasshofer Defendants from arguing their personal jurisdiction claim, we will decide the issue.

-23-

the finding of personal jurisdiction in the case." The court did not conduct an evidentiary hearing specifically directed toward resolving the personal jurisdiction issue, but it heard testimony from Niemi and argument regarding personal jurisdiction at the preliminary injunction hearing. At the conclusion of that hearing, the court concluded that personal jurisdiction in the District of Colorado over the Lasshofer Defendants was proper and pronounced that "it's not even a close call." The court took the same position in denying the Lasshofer Defendants' Rule 12(b) motion to dismiss for lack of personal jurisdiction. We conclude that under either evidentiary standard, the district court's finding of personal jurisdiction was correct with respect to all but one of the Lasshofer Defendants.

"In determining whether a federal court has personal jurisdiction over a defendant, the court must determine (1) whether the applicable statute potentially confers jurisdiction by authorizing service of process on the defendant and (2) whether the exercise of jurisdiction comports with due process." Trujillo v. Williams, 465 F.3d 1210, 1217 (10th Cir. 2006) (quotation omitted). Because Colorado's long-arm statute "confers the maximum jurisdiction permissible consistent with the Due Process Clause . . . the first, statutory, inquiry effectively collapses into the second, constitutional, analysis." Dudnikov, 514 F.3d at 1070 (citation omitted). In order to evaluate whether the exercise of personal jurisdiction comports with due process, we must first assess whether "the defendant has such minimum contacts with the forum state that he should reasonably anticipate being haled into court there. This minimum-contacts standard may be satisfied by showing general or specific jurisdiction." Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.,

-24-

618 F.3d 1153, 1159-60 (10th Cir. 2010) (quotations omitted). "[I]f the defendant has minimum contacts within the forum state, we determine whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice." Id. at 1160 (quotations omitted).

Because the parties concur that general jurisdiction does not exist as to the Lasshofer Defendants in the District of Colorado, we must determine whether the court has specific jurisdiction. We agree with Plaintiffs that the correct measure of specific jurisdiction in this case is the "purposeful direction" test applicable to tort actions, rather than the "purposeful availment" test used in contract cases. See Dudnikov, 514 F.3d at 1071. "In tort-based lawsuits such as this one, 'purposeful direction' has three elements: (a) an intentional action . . . that was (b) expressly aimed at the forum state . . . with (c) knowledge that the brunt of the injury would be felt in the forum state." Newsome v. Gallacher, 722 F.3d 1257, 1264-65 (10th Cir. 2013) (quotation omitted). We reject Appellants' argument that use of the tort-focused purposeful direction test distances the theory of the case from the Loan Agreement and precludes a recovery of damages based upon failure to fund the loan. As explained above, the Loan Agreement is properly viewed as one part of the fraud alleged by Plaintiffs.

We have no doubt, and Appellants do not appear to contest, that the actions of the Lasshofer Defendants were intentional. The district court's analysis as to the other two prongs of the test is apt:

Mr. Lasshofer and his Innovatis group knew unquestionably from the

-25-

documents, from his interaction with Burgess, and from his meetings and conversations with Mr. Niemi that Innovatis was participating or was alleged to have committed to participate in loans to entities in Colorado for the purpose of developing a resort at Breckenridge, Colorado. He was, beyond any question, aware of Mr. Niemi being a Colorado individual; one of his partners being a Colorado resident as well; the project being in Colorado; the loan funds were to be extended to and used in Colorado.

Niemi and Naegele are Colorado residents. The Loan Agreement states that the Azco entities and Mesatex are Colorado entities. The Fairmont Breckenridge project that was to be funded with Prosperity as Lender and Innovatis as Beneficiary was located in Colorado. Defendants' awareness of the location of the project is obvious from the Loan Agreement's statement that "[t]he Property is located in Breckenridge, Colorado." In their Amended Complaint, Plaintiffs recount that Lasshofer said he understood the hardship being caused by the delay in loan funding. We therefore conclude that the fraudulent financing scheme was expressly aimed at Colorado, and that it was equally clear the effects of the project's failure would be felt mainly in Colorado.

The Lasshofer Defendants argue that the district court erred in failing to consider personal jurisdiction over each of them individually. Home-Stake Prod. Co. v. Talon Petroleum, C.A., 907 F.2d 1012, 1020 (10th Cir. 1990) ("Minimum contacts must be found as to each defendant over whom the court exercises jurisdiction."). We conclude that the evidence demonstrates sufficient minimum contacts for the court to exercise personal jurisdiction over Lasshofer himself, Innovatis GmbH, and IAM.

Appellants contend that Plaintiffs had only limited contact with Lasshofer because their only in-person meeting with him took place in Austria and they had no other contact

-26-

with him until after Burgess' arrest. But the Austria meeting and Lasshofer's communications after Burgess was arrested are more than enough to establish that Lasshofer was intentionally directing tortious action at Colorado. At the meeting in Austria, Lasshofer acknowledged the hardship caused by delayed funding to Niemi's project in Colorado. And Lasshofer's communications following Burgess' arrest promised imminent funding for the project. Moreover, in addition to Burgess' indications that he was working in association with Lasshofer to secure the loan funding, the record includes emails and letters signed by Lasshofer that were intended to provide reassurance that funding was forthcoming. For example, Burgess forwarded Niemi a November 2009 letter signed by Lasshofer confirming that IAM would make certain securities available to Prosperity to fund projects under consideration. Lasshofer also responded to an email from Niemi after their meeting in Austria, confirming that Burgess would keep Niemi informed of the progress of the loan funding. In May and June 2010, Niemi received two letters signed by Lasshofer indicating that Innovatis had received instructions to wire loan funding.

Appellants argue that Lasshofer's actions are ascribable to IAM, and that because Lasshofer was not an officer or director of IAM, but rather an agent, he is not subject to the long-arm statute. See Wilshire Oil Co. of Tex. v. Riffe, 409 F.2d 1277, 1281 n.8 (10th Cir. 1969). But "status as employees does not somehow insulate [defendants] from jurisdiction," and the Supreme Court has confirmed that such defendants' contacts must be assessed individually. Calder v. Jones, 465 U.S. 783, 790 (1984). As in Calder, the

seminal case regarding personal jurisdiction stemming from tortious conduct, we hold that Lasshofer was a "primary participant[] in an alleged wrongdoing intentionally directed at" residents of the forum state, and thus personal jurisdiction over him as an individual is proper. Id.

There are also sufficient minimum contacts for two of the Innovatis Group companies. Plaintiffs presented a JVA between Prosperity and Innovatis GmbH that was sent to Niemi to prove that the two entities were working together to fund the Fairmont Breckenridge. Appellants' assertion that the document is a forgery is insufficient to negate personal jurisdiction. The fact that the JVA was signed after the Loan Agreement was executed is inapposite because it was allegedly sent to induce Plaintiffs to continue to rely on the fraudulent funding scheme. Plaintiffs also allege, and Appellants do not contest, that the metadata for several documents—including the letter from Lasshofer regarding securities that would be used to generate loan funding, a flowchart demonstrating funding progress, the JVA, and one of the memoranda confirming instructions to transfer funds—were created in the Innovatis GmbH office and/or by an Innovatis employee. As for IAM, that corporation is listed as the Beneficiary on the Loan Agreement itself. Appellants argue that IAM did not play a role in drafting or negotiating the Loan Agreement, but Appellants contradict this claim by arguing that Lasshofer was an agent of IAM.

We are persuaded, however, that Innovatis Immobilien GmbH could not have taken action exposing it to personal jurisdiction because it did not exist until a year after

-28-

the latest events underlying the suit. Plaintiffs have not directed us to any evidence in the record contradicting this statement or otherwise implying minimum contacts with regard to Innovatis Immobilien GmbH. "Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence." Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1246 n.13 (10th Cir. 2003) (quotation omitted).

Because we conclude that sufficient minimum contacts exist to sustain personal jurisdiction over Lasshofer, Innovatis GmbH, and IAM, we must consider whether the court's exercise of personal jurisdiction "offends traditional notions of fair play and substantial justice." Pro Axess, Inc. v. Orlux Distrib., Inc., 428 F.3d 1270, 1279 (10th Cir. 2005) (quotation omitted). Defendants that "purposefully directed [their] activities at" the forum state, id. at 1280 (quotation and alteration omitted), can defeat personal jurisdiction only by "present[ing] a compelling case that the presence of some other considerations would render jurisdiction unreasonable," id. (quotation omitted). No such considerations have been brought to our attention. Based on the foregoing analysis, the judgment of the district court regarding personal jurisdiction is affirmed with regard to Lasshofer, Innovatis GmbH, and IAM, but reversed with regard to Innovatis Immobilien GmbH.[9]

---

[9] Appellees argue that an additional basis for personal jurisdiction over the Lasshofer Defendants is a co-conspirator's presence and perpetration of the fraud in the forum state. See Melea, Ltd. v. Jawer SA, 511 F.3d 1060, 1070 (10th Cir. 2007). We do not find it necessary to reach this theory in order to conclude that sufficient minimum contacts exist as to Lasshofer, Innovatis GmbH, and IAM. Assuming arguendo that the

Continued . . .

## C

Appellants' final challenge to the district court's authority to hear this case involves venue. They claim that venue did not lie in the District of Colorado due to the forum selection clause contained in the Loan Agreement, which states, in relevant part:

> (b) Any legal suit, action or proceeding against Lender or Borrower arising out of or relating to this agreement shall be instituted in any federal or state court in New York County, New York and Borrower waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, and Borrower hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.

(Capitalization omitted.) The district court articulated several grounds for rejecting Appellants' venue arguments. "The enforceability of a forum selection clause is a question of law which we review de novo." K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW"), 314 F.3d 494, 497 (10th Cir. 2002) (quotations and alterations omitted).

After challenging venue during the preliminary injunction proceedings, Appellants renewed that challenge as part of their Rule 12(b) motion to dismiss. During the pendency of this appeal, the Supreme Court held that the proper mechanism for enforcement of a forum selection clause is a motion to transfer under 28 U.S.C. § 1404(a), not a motion to dismiss under Rule 12(b)(3). Atlantic Marine Construction Co.

---

theory has merit, it would not support minimum contacts as to Innovatis Immobilien GmbH, given that it would be temporally impossible for that entity to have participated in the conspiracy underlying the lawsuit.

-30-

v. United States District Court for the Western District of Texas, 134 S. Ct. 568, 575 (2013). Because we conclude that the district court's rejection of the forum selection clause was clearly correct, we do not need to reach the question of whether we could reverse the district court's denial of an improper Rule 12(b)(3) motion.

We will enforce a mandatory forum selection clause unless the party challenging it "clearly show[s] that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972). At the preliminary injunction hearing, the district court deemed the forum selection clause unenforceable because: (1) enforcement would be unreasonable and unjust after the Lasshofer defendants indicated they would also challenge jurisdiction in New York and because the clause appeared to be a "one-way street" binding only Plaintiffs; (2) the Lasshofer Defendants were not signatories to the Loan Agreement; and (3) Plaintiffs' assent to the forum selection clause was fraudulently induced. In denying the Rule 12(b) motion to dismiss, the district court stated that it had already considered and ruled on the venue issue, and focused on its previously articulated concern that Plaintiffs would be left without a forum. From among the several independent reasons the district court provided for refusing to enforce the forum selection clause, we focus on the one that implicates the overarching theme of this case—fraud.

We have already explained that we consider the Loan Agreement to have been procured through fraud and employed in the service of a larger fraudulent scheme, which was sufficient to void the non-assignment provision. But voiding a mandatory forum

selection clause requires somewhat more.  This court has taken the position that "[a] plaintiff seeking to avoid a choice provision on a fraud theory must . . . plead fraud going to the specific provision."  Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 960 (10th Cir. 1992); see also Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1974) (a "forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion").

According to Niemi's sworn declaration, the inclusion of the forum selection clause was the product of fraud.  Niemi recounts that during the contract negotiations, he inquired of Burgess why the forum clause stipulated that legal action must be brought in New York despite the project being located in Colorado.  Burgess responded that in all the loan agreements he and Lasshofer made with borrowers, Lasshofer required such a provision, and did so because New York was international businessmen's frequent choice of forum.  Niemi avers that, as stated in the complaint, he later learned that Burgess and Lasshofer never actually loaned anyone else money.  Niemi's testimony at the preliminary injunction hearing reiterated the substance of this declaration.

The district court found the evidence described above, which it noted was uncontradicted, sufficient to establish that the forum selection clause itself was fraudulently induced.  On appeal, Appellants again fail to challenge the facts asserted in Niemi's declaration and testimony.  They argue instead that Niemi neglected to state that he would not have agreed to the forum provision if he had known that no other loans existed, and that such a claim would be implausible given the difficulty Niemi had faced

in finding a Phase II lender. We conclude it was implicit from Niemi's declaration and testimony that he would not have agreed to the forum provision if he knew Burgess was lying, and that such an assumption also comports with common sense. We agree with the district court that Niemi has adequately demonstrated that the forum selection clause was fraudulently induced, and thus reject Appellants' venue challenge.

**IV**

Finally, Appellants claim several errors in the district court's assessment and award of damages. After granting Plaintiffs' motion for default judgment, the district court held a hearing to allow both sides to present evidence regarding damages. See Venable v. Haislip, 721 F.2d 297, 300 (10th Cir. 1983) ("[A] court may not enter a default judgment without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation."). After the hearing, the district court issued a judgment against the Lasshofer Defendants in the amount of $61,692,492. It then granted Plaintiff's motion to treble damages pursuant to COCCA, awarding up to $185,077,476.

We review a district court's decision to enter default judgment for an abuse of discretion. Olcott v. Del. Flood Co., 327 F.3d 1115, 1124 (10th Cir. 2003). "We will not disturb the court's decision without a clear showing that the decision was based on a clearly erroneous factual finding or that it manifests a clear error of judgment." Id. If, as in this case, a district court makes factual findings based on witness credibility that inform its damages calculation, we "give due regard to the trial court's opportunity to judge the witnesses' credibility" and do not set aside factual findings "unless clearly

-33-

erroneous."  Fed. R. Civ. P. 52(a).

At the damages hearing, Plaintiffs introduced, through Niemi, a document that calculated damages in two different ways ("Exhibit 1").  One column showed Plaintiffs' damages based on calculations of the "Value of Property Lost."  It listed the values of each of the three Fairmont Breckenridge properties[10] as calculated in the Niemi Report (noting that these values reflected appraisals performed in 2008) plus the $2.18 million loan commitment fee and collateral deposit, for a total of $62,530,000.  A separate column showed Plaintiffs' damages based on "Amounts Actually Paid and Lost."  It included the value of each property as calculated by adding the purchase price and cost of development (resulting in values significantly lower than those in the other column), the $2.18 million commitment fee and collateral deposit, $9.7 million in additional loans, and $1,111,742 in accounts payable for expenses such as subcontractor and legal fees.  The damages total in this column was nearly equivalent to the other, adding up to $61,692,492.  The chart explained that the "additional loans" and "accounts payable" figures in the "Amounts Actually Paid and Lost" calculation were almost entirely subsumed in the values of the properties listed in the "Value of Property Lost" calculation.

During the damages hearing, the district court questioned Niemi directly about the

---

[10] At the damages hearing, Niemi clarified that the values for Fairmont Residences on the River and Fairmont River Lodge should be switched.  There is no evidence that the error affects the validity of any of the calculations used in reaching the ultimate damages figure.

amounts paid in debt and equity to purchase the three properties. Niemi responded that the figure was approximately $47 million, consisting of approximately $29 million in debt and $17-18 million in cash equity. Niemi explained that the amount requested was higher than the total of these two figures because the value of the properties increased with the work and investment put into them.

The district court's oral damages ruling began with factual findings with respect to credibility. It stated: "[T]his Court has assessed Mr. Niemi, using all of the means by which we assess the credibility of witnesses. And all of the ways that we instruct juries to assess the credibility of witnesses. . . . And the Court finds beyond any question that he is entirely credible."

In making its damages ruling, the district court unequivocally relied on the second damages calculation, the "Amounts Actually Paid and Lost." It found that Plaintiffs' damages were at least $47 million dollars, but that additional damages were warranted because the value of the properties grew as Plaintiffs "put improvements in . . . obtained permits, licenses, and it grew because of sweat equity." The court ruled as follows:

> [T]he court finds that these three men are entitled to be made whole, not just for 47 million that's their out-of-pocket, but for what they lost . . . . Now, Plaintiffs' Exhibit 1 goes at this process in two different ways. One is called the value of the property lost. That is essentially the Niemi opinion that incorporates or is based in part on the three appraisals that were obtained in 2008 . . . . And those numbers add up, just the value of the property lost, based on those appraisals, plus the $2,180,000 [commitment fee and collateral deposit] to $62,530,000.
> Now, the plaintiffs didn't just present that approach. They presented another approach which they call amounts actually paid and lost. And I questioned Mr. Niemi about that set of numbers because I was concerned

-35-

that maybe some of these lenders have gotten some of their money back might suggest that these numbers should be reduced. But he explained that he didn't include those loans in his numbers. And these numbers added up to $61,692,492. Practically the same amount. Arrived at two completely different ways.

The court then concluded that its "finding of fact, based on the evidence and credibility of witnesses, is that the actual loss to the plaintiffs is $61,692,492," and it awarded them that amount (before trebling).

Although "we review the amount of a damage award for clear error, the methodology a district court uses in calculating a damage award, such as determining the proper elements of the award or the proper scope of recovery, is a question of law we review de novo." Sw. Stainless, LP v. Sappington, 582 F.3d 1176, 1183 (10th Cir. 2009) (quotation omitted). The amount of damages is a finding of fact, and is clearly erroneous only "if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." Id. (quotation omitted).

In challenging the damages award, Appellants would have us pretend that the district court reached its judgment based on what that court called the "Niemi opinion"— a report prepared by Niemi and submitted as part of his proposed expert testimony under Fed. R. Evid. 702. Had the district court actually based its damages calculation on the values contained in Niemi's expert report and the testimony derived therefrom, we would

have occasion to review the propriety of allowing Niemi to testify as an expert.[11] Instead, we conclude that the admission of any expert testimony by Niemi was harmless error because it did not influence the district court's opinion.

Straightforward testimony about the price—in debt and equity—that Plaintiffs paid to purchase and improve the Fairmont Breckenridge properties is materially different from the purported expert analysis in Niemi's written report and the testimony derived therefrom. It was appropriate for the trial court to admit this testimony without considering Niemi an expert witness. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has

---

[11] We have considerable doubts about the admissibility of the Niemi Report and accompanying testimony, which posited values for the Fairmont Breckenridge properties that were equivalent to those in previous professional appraisals and were based upon those appraisals and Niemi's experience as an "expert." The Lasshofer Defendants moved to exclude Niemi's testimony as inadmissible either as expert testimony under Fed. R. Evid. 702 or as lay opinion testimony under Fed. R. Evid 701. The district court denied the motion, stating that it did not "consider [Niemi] to have been an expert witness as such." In James River Insurance Co. v. Rapid Funding, LLC, 658 F.3d 1207 (10th Cir. 2011), we reversed the district court's decision to admit analogous testimony under Rule 701 because: (1) the testimony required technical judgment and professional experience "beyond the scope of lay opinion testimony"; (2) the witness' calculations were "based in part on his professional experience in real estate"; (3) the witness "relied on a technical report by an outside expert"; and (4) "the Federal Rules of Evidence generally consider landowner testimony about land value to be expert opinion." Id. at 1214-16. The district court did not conduct a Daubert hearing or make any ruling as to whether Niemi's testimony based on his Report was admissible as expert testimony. See Water Pik, Inc. v. Med-Systems, Inc., 726 F.3d 1136, 1145 (10th Cir. 2013) (district court must perform "gatekeeping" role under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." (quotations omitted)).

-37-

personal knowledge of the matter.  Evidence to prove personal knowledge may consist of the witness's own testimony.").  Because the district court could—and did—base its damages award entirely on the "Amounts Actually Paid and Lost" in Exhibit 1 and Niemi's explanation of that figure, which the court deemed to be calculated in a manner "completely different" from the damages in the Niemi Report, we do not need to consider whether the district court could have properly allowed Niemi to testify as an expert or admitted the analysis in the Niemi Report as lay testimony.  We conclude that any error arising from the admission of the Niemi Report and explanatory testimony was harmless.  See Fed. R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ."); see also Motley v. Marathon Oil Co., 71 F.3d 1547, 1553 (10th Cir. 1995) (any error in admitting evidence harmless if objecting party fails to "establish that . . . substantial rights were affected").

Appellants contend that the district court's damages award is based on an improper shifting of the burden of proof.  A plaintiff bears the burden of proving his damages.  Morsey v. Chevron, USA, Inc., 94 F.3d 1470, 1476 (10th Cir. 1996).  Appellants observe that the district court criticized the Lasshofer Defendants for putting on only one witness who critiqued Niemi's testimony without offering positive testimony of his own.  We do not equate such criticism with an improper shifting of the burden.  To the contrary, the district court found that only the Plaintiffs presented positive damages evidence, found that evidence credible, and entered a damages award accordingly.  "We view the evidence in the light most favorable to the district court's ruling and must

uphold any district court finding that is permissible in light of the evidence."

Weyerhaeuser Co. v. Brantley, 510 F.3d 1256, 1262 (10th Cir. 2007). Nothing in the record persuades us that an improper burden shifting occurred.

We are similarly unpersuaded by Appellants' arguments that the damages award was based on speculative evidence. Appellants point to statements made by Niemi at the damages hearing in which he approximated numbers not included in Exhibit 1, such as the breakdown of debt versus equity lost by Plaintiffs. But there is no evidence that the figures provided in Exhibit 1, upon which the district court relied in making its damages award, were merely "guesswork." Moreover, the district court found as a matter of fact that Niemi's testimony was credible and sufficient to support its damages award without additional documentation. The district court did not rely on Niemi's calculation of the "Value of Property Lost," and therefore did not rely on the professional appraisals that Appellants challenge as inadmissible hearsay. We discern no clear error.

Finally, we address Appellants' claims that the damages award should be vacated due to Plaintiffs' failure to prove causation. To the extent that this challenge calls into question the methodology of the district court's damages award, we review it de novo. Sw. Stainless, 582 F.3d at 1183. The permissible scope of damages under both COCCA and common law fraud is a question of Colorado law. Colorado allows "recovery in fraud . . . to the extent that the value of the contractual benefits conferred falls short of the value as represented, plus any other damages naturally and proximately caused by the misrepresentation." Ballow v. PHICO Ins. Co., 878 P.2d 672, 677 (Colo. 1994) (en banc)

(footnote omitted). "The measure of damages . . . is the benefit of the bargain rule, designed to give the plaintiff his or her expectation interest for loss of bargain." Id. at 677 n.5 (quotation omitted). The COCCA claim is a state-law claim based on Lasshofer's alleged frauds. See Colo. Rev. Stat. §§ 18-17-103(5)(a), -104(3) (incorporating RICO definition of racketeering activity, which includes both mail and wire fraud, and prohibiting a pattern of racketeering activity). We do not hesitate to conclude that the damages fall within the scope of the "benefit of the bargain." There is ample evidence that, throughout the ongoing fraud perpetuated by the defendants, they were aware that refusing to deliver the promised loan proceeds would result in the failure of the Fairmont Breckenridge project. Plaintiffs' damages are demonstrably a result of that project's failure.[12]

To the extent that Appellants' causation argument rests on its contention that the project would have failed even absent the fraud, the argument implicates the factual findings of the district court and fails on clear error review. Appellants essentially ask us to speculate that "lean economic times," Niemi I, 728 F.3d at 1253, and the difficulties Plaintiffs faced in obtaining Phase II financing mandate a conclusion that the damages award exceeds the "natural and proximate consequence[s] of the fraud." Trimble v. City & Cnty. of Denver, 697 P.2d 716, 724 (Colo. 1985), superseded by statute as recognized

---

[12] Plaintiffs originally sought over $153 million in damages, a figure that included their calculation of lost profits and would arguably also fall within the benefit of the bargain, but subsequently reduced their damages request.

in Colo. Dep't of Transp. v. Brown Grp. Retail, Inc., 182 P.3d 687 (Colo. 2008). We disagree. The district court heard evidence that Plaintiffs' project had sold well in early offerings, received positive press, and was unique in the market such that the economic downturn was less harmful to it than to other projects. On clear error review, we will not disturb the district court's factual finding that "more likely than not, [Plaintiffs' project] would have been successful. A huge success. But for the lack of financing."

Based on the foregoing analysis, we affirm the district court's award of damages.[13]

---

[13] Appellants argue that if the case is remanded it should be reassigned to a different judge in order to ensure due process and preserve the appearance of justice. "Because of the extraordinary nature of such an order . . . we will remand with instructions for assignment of a different judge only when there is proof of personal bias or under extreme circumstances." Procter & Gamble Co. v. Haugen, 427 F.3d 727, 744 (10th Cir. 2005) (quotations omitted). To evaluate the necessity of reassignment "in the absence of personal bias," we have used a three-part test analyzing:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

Mitchell v. Maynard, 80 F.3d 1443, 1450 (10th Cir. 1996) (quotation omitted).
Contrary to Appellants' contentions, a judge's determinations in favor of one party do not indicate bias or the inability to decide fairly in subsequent rulings. See Bixler, 596 F.3d at 762 ("Adverse rulings alone do not demonstrate judicial bias."); Mitchell, 80 F.3d at 1449 ("[P]rior adverse rulings cannot in themselves create grounds for disqualification."). Our review of the record does not reveal that the district court was biased against the Lasshofer Defendants, and the factors identified in Mitchell do not weigh in favor of reassignment. We note that the Niemi I panel praised the district court's "extraordinary diligence, rectitude, and care" in handling the case, 728 F.3d at

Continued . . .

## V

We **DENY** Plaintiffs' motion to dismiss the appeal based on the fugitive disentitlement doctrine and **DENY** Appellants' motion to file a surreply with respect to that motion. We also **DENY** Plaintiff's motion to require Appellants to post a bond or obtain a stay in order to appeal. The outstanding requests to award costs and fees are **DENIED**.

The judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART**. We **AFFIRM** the district court's award of damages, except to the extent that it applies to Innovatis Immobilien GmbH. We also direct the district court to **VACATE** its order of contempt, as well as the sanctions and bench warrant premised upon it, in light of this court's decision vacating the preliminary injunction upon which they are based. We **REMAND** for proceedings consistent with this opinion.

---

1263, and we see no reason to deviate from that assessment.