*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CM-0963

RANJITH V. KEERIKKATTIL, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2015-CMD-017652)

(Hon. Robert A. Salerno & James A. Crowell, Trial Judges)

(Argued February 14, 2024                    Decided April 25, 2024)

*David H. Reiter* for appellant.

*Anne Y. Park*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *John G. Giovannelli*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and DEAHL and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: In 2015, appellant Ranjith V. Keerikkattil was terminated from Deloitte Consulting for acting inappropriately toward a junior colleague, S.S. Mr. Keerikkattil then embarked on a months-long campaign of retribution against S.S., in which he, among other things, repeatedly sent S.S.

threatening texts and emails; sent letters and communications to Deloitte and government agencies claiming that S.S. had engaged in misconduct; and showed up on the doorstep of S.S.'s parents, who lived across the country. Following a jury trial in the D.C. Superior Court, Mr. Keerikkattil was convicted of criminal stalking under D.C. Code § 23-3133.

Mr. Keerikkattil appeals, arguing that the trial court's failure to instruct the jury that it needed to find that his communications fell within one of the narrowly defined categories of unprotected speech as required by our recent decision in *Mashaud v. Boone*, 295 A.3d 1139 (D.C. 2023) (en banc), violated his First Amendment rights. But Mr. Keerikkattil never asked the trial court for such an instruction, and we hold that any error did not affect his substantial rights and thus does not warrant reversal. Mr. Keerikkattil also challenges the sufficiency of the evidence against him, the Superior Court's jurisdiction, and two aspects of his sentencing. We affirm Mr. Keerikkattil's conviction but remand for the trial court to reconsider its imposition of probation at sentencing.

## I.     Background

### A.     Factual Background

The government's evidence at trial supported the following.  During the relevant time period, S.S. lived in the District of Columbia.  In early 2015, at the age of twenty-three, she began working as a business technology analyst—an entry-level position—at Deloitte.  A month after she started working at Deloitte, S.S. met Mr. Keerikkattil, who worked as a senior consultant within the same information-management group, a position two levels senior to S.S.

After she expressed interest, Mr. Keerikkattil asked S.S. to collaborate on a large proposal he was working on.  Proposals are essentially sales pitches to win the federal contracts that make up the "lifeblood" of Deloitte's federal consulting practice.  S.S. understood that working on the proposal would give her exposure, help her develop "an important skill set," and be a "good learning experience."  It was her first time working on a proposal.

S.S. and Mr. Keerikkattil worked closely on the proposal, spending the better part of forty hours a week over several months either together in person or communicating with each other.  Their collaboration often included working outside the firm's office, including at a common area in S.S.'s apartment building.

S.S. testified that Mr. Keerikkattil's questions and conduct veered at times too far into the personal. For example, he once asked her if the reason she was wearing a one-piece swimsuit in a Facebook picture was because she had recently gained weight. S.S. told Mr. Keerikkattil that his comments were "inappropriate" and "rude and hurtful." Mr. Keerikkattil later apologized via text. In his apology, however, Mr. Keerikkattil told S.S. that she was "cute[,] slim[,] and sexy! Big time." Eventually, and repeatedly, S.S. told Mr. Keerikkattil that she wanted to keep their relationship professional and that he should text her only about work-related topics. Nevertheless, Mr. Keerikkattil continued to reach out socially, by, for example, inviting S.S. out to drinks and buying her a bottle of alcohol as a gift.

The day after S.S. rejected Mr. Keerikkattil's invitation to "grab a drink" socially, Mr. Keerikkattil emailed S.S. a "Cease & Desist Letter." The email apprised S.S. that Mr. Keerikkattil would not be working directly with her anymore and that she should work with others on the team instead. It asked her to "please refrain from contacting [him] except for legitimate business needs of Deloitte LLP." S.S. cried when she received the email, and she did not understand if there were legal ramifications stemming from it. She felt she "was being attacked and punished for not reciprocating [Mr. Keerikkattil's] advances." Per the request in the email, S.S. ceased contacting Mr. Keerikkattil.

Mr. Keerikkattil, however, continued contacting S.S. He approached her at a work event, and he messaged her privately. S.S. reported the situation to Deloitte. Deloitte terminated Mr. Keerikkattil for lying during its investigation into S.S.'s report. What followed Mr. Keerikkattil's termination was a campaign of retribution against S.S. over the summer and fall of 2015.

After his termination, Mr. Keerikkattil emailed Vikram Rajan—another Deloitte employee who Mr. Keerikkattil had learned was dating S.S.—requesting that he "preserve" "[a]ny and all communications between [Mr. Rajan] and [S.S.] . . . , including but not limited to any sexually explicit text messages and [instant messages] exchanged such as 'I want to eat you [S.S.].'" The email copied S.S. It explained that Mr. Keerikkattil had "no interest in [S.S.], but [he was] interested in the inappropriate and non-professional relationship between [S.S. and Mr. Rajan] as evidence of [S.S.'s] character and conduct, as well as for violation of Deloitte policies." The email concluded: "So go ahead and continue to bring [S.S.] over to your place, have sex with her or whatever. I'll make sure that all the shenanigans are captured. The more evidence against [S.S.], the stronger that charges against her become[ ]." Mr. Keerikkattil sent a similar "litigation-hold" email to S.S.

On July 6, 2015, Mr. Keerikkattil emailed S.S. again. The email copied other, more senior, Deloitte employees and alleged that S.S. had violated Deloitte's "Code of Ethics & Professional Conduct" because of her "inappropriate close relationship" with Mr. Rajan, that she had committed "blatant fraud" with respect to her timekeeping, and that there was "probable cause to believe [she] had violated 20 U.S.C. § 1097(a), a federal felony[,] by not discussing drug related misconduct while applying for federal student aid." Mr. Keerikkattil stated that S.S. could face "up to 5 years in prison and [a] fine up to $20,000." Mr. Keerikkattil closed the email by "assur[ing] [S.S.] that irrespective of how long it takes or whatever it costs we will get to the bottom of [her] lies and misrepresentations."

S.S. denied the allegations in Mr. Keerikkattil's email. She contested the allegation about an inappropriate relationship with Mr. Rajan. Although they were dating, she testified that the relationship did not violate any Deloitte rules and that they had reported the relationship to human resources. She further denied having "committed blatant fraud," as the email alleged, regarding her timekeeping. As for the drug use, S.S. testified that she had disclosed prior drug use when she applied for a security clearance, and she had not engaged in any drug-related misconduct.

On July 28, Mr. Keerikkattil emailed S.S. to notify her of an impending lawsuit against her. The email explained that if she did not offer a convenient

location to be served, he would be forced to have a sheriff serve her at Deloitte, "which might be embarrassing for you." It asked her to "[p]lease take note of the intentional personal injury tort claims against you. You could end up paying damages for the rest of your life . . . ." The email continued, "[i]f you are willing to be truthful and recognize the damages that you've caused, I might be able to help you out. After all[,] my intention here is not to ruin your future or ruin you financially." S.S.'s lawyer, who also represented Deloitte, responded and "instructed [Mr. Keerikkattil] to direct any communications intended for [S.S.], regardless of subject matter or context, exclusively to [the lawyer] or [their] designee(s)."

Shortly after the email exchange, S.S. saw Mr. Keerikkattil outside a café they used to work in together near the Deloitte office. The two made eye contact, and S.S. returned to the office and notified security.

In September 2015, Mr. Keerikkattil sent a letter to the Internal Revenue Service (IRS) about S.S. regarding her work on a Deloitte project involving the agency. The letter alleged that S.S. had been "fired from the Bureau of Engraving and Printing . . . allegedly due to illegal drug use history." The letter requested that the agency "launch an inquiry into how [S.S.] was able to obtain a position with [the]

IRS despite being fired from [the Bureau of Engraving and Printing] and whether any IRS[ ] policies were violated with regard[ ] to her hiring."

S.S. denied these allegations as well. She had previously completed a security-clearance application for a project involving the Bureau of Engraving and Printing, but she withdrew the application after learning that it might be denied due to her prior drug use. She had truthfully answered questions relating to that drug use on the application. She further testified that she had never been denied a clearance or been fired.

On October 1, Mr. Keerikkattil texted S.S. again. Mr. Keerikkattil wrote: "You'd have forgotten me but how can I for what you've done to me . . . ." He blamed her for making his "life hell" and not "car[ing] about others." Finally, he told S.S.: "I would have forgiven you if you had expressed regret for what all I had to suffer because of you. But instead you wanna fight. Then let's do exactly that."

On October 9, Mr. Keerikkattil followed up with yet more texts. He let S.S. know that he was "going to return what [she had done] to [him] with interest." Among other things, he told her: "[s]it back and enjoy as I fuck up your life." He added specifically: "[n]ow guess who all know about the illegal drug use history and your expulsion from [the Bureau of Engraving and Printing]."

This series of texts "paralyz[ed]" S.S. She testified that she cried over them and that they "haunt[ed]" her. She contacted the police.

On October 24, Mr. Keerikkattil texted S.S. again. He had travelled to S.S.'s childhood home in Oregon and knocked on the front door. He had handed S.S.'s father his business card before leaving. S.S.'s father immediately contacted his daughter about the incident and notified the police. Mr. Keerikkattil texted S.S. that it "[w]as nice meeting [her] dad today," along with other related messages. S.S. reported the incident to Deloitte's human resources and legal teams.

After Mr. Keerikkattil's trip to Oregon, S.S. began leaving the office only during the daytime and taking more circuitous routes home. Her friends started escorting her places because she did not feel "safe to go out on [her] own." S.S. also obtained a civil protection order against Mr. Keerikkattil.

After considering this evidence, the jury found Mr. Keerikkattil guilty of criminal stalking under D.C. Code § 22-3133. The Superior Court sentenced Mr. Keerikkattil to twelve months of incarceration and, over Mr. Keerikkattil's objection, suspended one of those months in exchange for five years of supervised probation.

## B.     Legal Background

A guilty verdict under D.C.'s criminal stalking statute requires the jury to find, in relevant part, that the defendant "purposefully engage[d] in a course of conduct directed at a specific individual" that the defendant "should have known would cause a reasonable person in the individual's circumstances to: (A) Fear for his or her safety or the safety of another person; (B) Feel seriously alarmed, disturbed, or frightened; or (C) Suffer emotional distress." D.C. Code § 22-3133(a). Although a finding that the defendant should have known the victim would suffer any of these three categories suffices, we have described emotional distress as "the broadest of the three categories" and have referred to all of the categories collectively as emotional distress. *Mashaud v. Boone*, 295 A.3d 1139, 1148 (D.C. 2023) (en banc). The statute defines "[e]motional distress" as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." D.C. Code § 22-3132(4). To constitute a "course of conduct," the defendant must have acted "on 2 or more occasions" either "directly or indirectly, or through one or more third persons." *Id.* § 22-3132(8).

The trial court instructed the jury that it must find that Mr. Keerikkattil "voluntarily and on purpose" "did directly or indirectly follow, monitor, threaten or communicate to or about [S.S.]" "on two or more occasions." The jurors were also

instructed that they must find that "when he did so, he should have known that his conduct would cause a reasonable person in [S.S.'s] circumstances to [ ] fear for her safety or the safety of another[;] or [ ] feel seriously alarmed, disturbed, or frightened[;] or [ ] suffer emotional distress." The trial court cautioned the jurors that "[f]iling a lawsuit is constitutionally protected activity. You may not consider the fact that such lawsuits were filed, or any statements made to a court during such lawsuits, as part of the conduct that the government must prove beyond a reasonable doubt." Nevertheless, "communicating directly or indirectly to a person involved in a lawsuit . . . is not constitutionally protected and may be considered by you in determining whether the government has proven the offense beyond a reasonable doubt."

The adequacy of the trial court's instructions must be considered in light of our subsequent decision in *Mashaud*. There, we significantly narrowed the scope of Section 22-3133 because, without modification, "[t]he constitutional problems with the statute [were] glaring." *Id.* at 1144. We interpreted the section "to mean that, when speech is at issue, the statute covers only speech that fits within the 'well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.'" *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 468-69 (2010)). "That includes threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct."

*Id.* "Outside of those narrow categories, speech is constitutionally protected activity that the statute does not apply to." *Id.* We refer to these "narrowly limited classes of speech," *Stevens*, 559 U.S. at 469, as the categorical exceptions. In light of *Mashaud*, a jury cannot consider the content of a defendant's speech as one of the occasions comprising a course of conduct for stalking unless it finds that the speech falls within a categorical exception. *Mashaud*, 295 A.3d at 1144.

## II.  Discussion

Mr. Keerikkattil raises four challenges to his conviction: he argues that (1) the trial court erred by failing to instruct the jury in a manner consistent with *Mashaud v. Boone*, 295 A.3d 1139 (D.C. 2023) (en banc); (2) the government presented insufficient evidence to convict him; (3) the trial court lacked jurisdiction to try him; and (4) the court imposed an illegal sentence upon him. We address each argument in turn, ultimately affirming Mr. Keerikkattil's conviction but remanding the case to the trial court for resentencing.[1]

---

[1] Mr. Keerikkattil also argues that the trial court erred, and violated his due-process rights, by not instructing the jury that it needed to find him more than merely negligent before convicting him, because we have established a heightened mens rea requirement for criminal threats. *See Carrell v. United States*, 165 A.3d 314, 317 (D.C. 2017) (en banc) ("We now hold that the government must prove the defendant's mens rea to utter the words as a threat, and that it may do so by establishing that the defendant acted with the purpose to threaten or with knowledge

## A.     Instructional Error

The gravamen of Mr. Keerikkattil's first claim on appeal—at least if interpreted generously—appears to be that the trial court erred by not instructing the jury that it must find beyond a reasonable doubt that his conduct was either nonexpressive conduct or conduct that fell within the narrowly defined bounds of a categorical exception to the First Amendment's protection.  In our view, any such error on the part of the trial court—which Mr. Keerikkattil failed to preserve—did not affect Mr. Keerikkattil's substantial rights and, as a result, does not warrant reversal.

### 1.     Standard of Review

Mr. Keerikkattil did not raise this First Amendment challenge with the trial court, and it is thus unpreserved.[2]  Unpreserved arguments are forfeited because the

---

that his words would be perceived as a threat."); *see also Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (requiring a mens rea of at least recklessness before a defendant may be convicted for speech constituting a true threat of violence). Implicit in Mr. Keerikkattil's argument is the assumption that the government needed to prove that his communications were criminal threats.  Because we conclude that the government could convict Mr. Keerikkattil without proving any of the communications at issue were threats, we do not reach this argument.

[2] Mr. Keerikkattil did raise a different First Amendment argument at trial.  He argued that the jury could not consider communications relating to the lawsuits he filed against S.S. and others because those statements were constitutionally protected.  The trial court accepted his objection, at least partially, and instructed the

failure to raise such arguments with the trial court deprives that court of the opportunity to remedy the error before or during trial. *See Puckett v. United States*, 556 U.S. 129, 134 (2009) (describing the justifications for the plain-error rule). We redress such unpreserved errors only where the defendant proves it was not just any error but plain error—a "difficult" standard to meet. *Greer v. United States*, 593 U.S. 503, 508 (2021) (internal quotation omitted); *see Grogan v. United States*, 271 A.3d 196, 212-13 (D.C. 2022) ("If [the requirements of plain-error review] are met, an appellate court may exercise its discretion to notice a forfeited error . . . ."); D.C. Super. Ct. Crim. R. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Because Mr. Keerikkattil did not present his First Amendment challenge to the jury instructions to the trial court, we review his claim for plain error only.

Under plain-error review, Mr. Keerikkattil must establish that (1) the trial court erred; (2) "the error was plain," meaning "clear or obvious"; (3) "the error affected his substantial rights"; and (4) "the error seriously affect[ed] the fairness,

---

jury not to consider the fact of the lawsuit or statements made in court, although it could consider communications directed to participants in the lawsuit. This First Amendment argument, however, is distinct from the argument Mr. Keerikkattil presses on appeal, and Mr. Keerikkattil does not argue in this court that he preserved his current First Amendment argument.

integrity, or public reputation of judicial proceedings." *Grogan*, 271 A.3d at 212-13 (internal quotations omitted).

Although Mr. Keerikkattil does not dispute that he forfeited his First Amendment argument in the trial court, he contends we must review the issue for structural error. We disagree.

Structural errors are those that "affect[ ] the framework within which the trial proceeds, rather than simply [ ] error[s] in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Structural errors entitle a defendant to automatic reversal because errors that undermine "the framework within which the trial proceeds" create "structural defects" that "defy analysis by 'harmless-error' standards." *Id.* at 309. Structural-error review and plain-error review are not mutually exclusive. When an error is subject to both plain-error review (because it was unpreserved) and structural-error review, the third prong of plain-error analysis—whether the error affected the defendant's substantial rights—essentially falls out of the picture. *See Arthur v. United States*, 986 A.2d 398, 413 (D.C. 2009) ("[I]f [an error] is structural in nature, the defendant's substantial rights will be deemed to have been affected, without need for further analysis in the context of the particular trial."); *see also Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (acknowledging, without resolving, petitioner's argument that a structural error

necessarily affects substantial rights); *Barrows v. United States*, 15 A.3d 673, 680 (D.C. 2011) (holding that although a structural error necessarily satisfies the third prong of plain-error review, a structural error "is not," by itself, "enough for a court to conclude that the fourth prong is satisfied").

In our view, the alleged error in this case is not structural. The Supreme Court has identified three categories of cases that involve structural errors: (1) cases involving the violation of a right "not designed to protect the defendant from erroneous conviction but instead protect[ ] some other interest"; (2) cases concerning errors with effects that "are simply too hard to measure"; and (3) cases with errors that "always result[ ] in fundamental unfairness." *Weaver v. Massachusetts*, 582 U.S. 286, 294-96 (2017) ("These categories are not rigid. In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural."). Mr. Keerikkattil contends that this case falls within the third category: errors that "result[ ] in fundamental unfairness." *Id.* at 296. We are not convinced.

An instructional error like the one at issue here, even one involving a constitutional right, does not "always result[ ] in fundamental unfairness." *Id.* Instructional errors are structural only if they "'vitiate[ ] *all* the jury's findings' and produce[ ] 'consequences that are necessarily unquantifiable and indeterminate.'"

*Neder v. United States*, 527 U.S. 1, 11 (1999) (citation omitted) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993)) (reviewing the trial court's omission of an essential element of the offense for harmless error rather than structural error); *accord Hedgpeth v. Pulido*, 555 U.S. 57, 58, 60-61 (2008) (per curiam) (applying harmless-error review to a trial court's instruction to a jury that it could convict the defendant based on an invalid theory of guilt and noting that "constitutional errors can be harmless"). Here, many of the jury's findings could remain intact notwithstanding the error. For example, findings relating to content-neutral speech, conduct, or speech that falls within a categorical exception would not run afoul of *Mashaud*. *See Mashaud*, 295 A.3d at 1144, 1160-61. What would have happened in a counterfactual world without the alleged error, therefore, is not "necessarily unquantifiable and indeterminate." *Neder*, 527 U.S. at 11 (internal quotation omitted). We can evaluate the counterfactual by considering what a jury would have done if confined only to the permissible evidence. *See, e.g.*, *Blades v. United States*, 200 A.3d 230, 242-43 (D.C. 2019) (analyzing the effect that inadmissible evidence had on the jury and concluding that the introduction of the inadmissible evidence "was harmless beyond a reasonable doubt"). This case is thus a far cry from the kind of instructional error that might result in automatic reversal, such as instructing a jury that it need not find guilt beyond a reasonable doubt. *See Sullivan v. Louisiana*,

508 U.S. 275, 281-82 (1993). The alleged error here is not structural, and Mr. Keerikkattil must establish all four prongs of plain error.

### 2. The Instructional Error Did Not Affect Mr. Keerikkattil's Substantial Rights

We hold that the trial court did not plainly err because, although the failure to provide the jury instruction at issue was erroneous, and that error was plain, it did not affect Mr. Keerikkattil's substantial rights.

On the first prong of plain-error review, the trial court erred because its failure to instruct the jury regarding exceptions to First Amendment protection conflicted with the standard set forth in *Mashaud*. In *Mashaud*, we held that where the alleged course of conduct establishing criminal stalking involves the content of speech, that speech must fall within a categorical exception to the First Amendment's protection. *See* 295 A.3d at 1144. The jury instructions in this case included no such limitations. The court instructed the jury that it need only find that Mr. Keerikkattil used "text[s], mail, instant messag[es], or . . . a website" to "follow, monitor, threaten or communicate to or about [S.S.]" in a way "he should have known" "would cause a reasonable person in [S.S.]'s circumstances to" "fear for her safety or the safety of another"; "feel seriously alarmed, disturbed or frightened"; or "suffer emotional distress." The court did not instruct the jury that it needed to find that Mr. Keerikkattil's speech constituted a "threat[ ], obscenity, defamation, fraud,

incitement, [or] speech integral to criminal conduct." *Id.* The instructions thus permitted the jury to consider a wide range of constitutionally protected communications that *Mashaud* placed outside the realm of consideration in stalking cases. *See id.*

That error also was plain, satisfying the second prong of plain-error review. The error may not have been obvious at the time of trial because we had not yet decided *Mashaud*. Nevertheless, we assess whether an error is plain based on the state of the law at the time of review, not the time of trial. *See Henderson v. United States*, 568 U.S. 266, 277 (2013) ("Thus, in the direct appeals of cases that are not yet final, we consider the 'time of review' interpretation the better reading of Rule 52's words 'plain error.'"); *accord Muir v. District of Columbia*, 129 A.3d 265, 274 (D.C. 2016) ("*Henderson*'s analysis of the plain error doctrine is persuasive, and because Superior Court Rule of Criminal Procedure 52(b) is derived from Federal Rule of Criminal Procedure 52(b) and identical to it in all material respects, we have every reason to follow *Henderson* and construe our Rule consistently."). Now, at the time of our review, *Mashaud* is the law, and it clearly establishes that a jury may find stalking based on a course of conduct involving the content of speech only if that speech falls within a categorical exception. 295 A.3d at 1144. The trial court's failure to instruct the jury as much constitutes clear or obvious error.

The United States resists this conclusion. It argues that the court did not err, or at least not clearly so, even under *Mashaud* because the conduct upon which the government relied at trial either (1) did not involve protected speech (or speech at all) or, if it did, (2) fell within a categorical exception. We are not persuaded.

First, even though some of the evidence the government relied on did not involve speech, that fact does not absolve the instructional error with respect to other occasions involving speech. Most of the government's evidence at trial involved Mr. Keerikkattil's text messages, emails, and letters. The government suggests that even if some of the conduct involved speech, much of that speech is not plainly protected by the First Amendment because it involved merely private communications.[3] In our view, this argument misframes the analysis. The ultimate question is not whether the consideration of the speech violates the First Amendment but rather whether it runs afoul of the saving construction of Section 22-3133 we crafted in *Mashaud*. *Mashaud* did not bless the statute's application in every

---

[3] We note that the government "[can]not generally prohibit or punish, in its capacity as sovereign, speech on the ground that it does not touch upon matters of public concern." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 600 (2008); *see Connick v. Myers*, 461 U.S. 138, 147 (1983) ("We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction."). Speech on matters of private concern retains First Amendment protection, even if that protection is "often less rigorous." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

situation that would pass strict scrutiny or some other constitutional test. Indeed, the court explicitly rejected such an interpretation because it would "walk[ ] right into a different and equally devastating constitutional problem," *Mashaud*, 295 A.3d at 1162: it would be unconstitutionally vague, *see id.* Instead, *Mashaud* established a specific test for which kinds of speech could fall under the statute. The speech either must violate the statute without any need to look at its content, or it must fall within a categorical exception such as defamation or true threats of violence. *See id.* at 1159-61. In this case, the government relied on the content of the speech in Mr. Keerikkattil's text messages, emails, and letters, and, as a result, that speech must fit within a categorical exception to comply with *Mashaud*.

That brings us to the government's second argument. It argues that the speech at issue in this case does, in fact, fall within various categorical exceptions and thus comports with *Mashaud*. The problem with this argument, however, is that whether the speech fits within a categorical exception involves, in part, factual determinations that the jury needed to make.

Consider, for example, the government's argument that the July 6 email to S.S. and other Deloitte employees and the September 29 letter to the IRS constitute defamation. Maybe so, but whether speech constitutes defamation, or falls within any other categorical exception, is not a purely legal question for a court to

determine—although the trial court could, in some cases, conclude as a matter of law that the speech did not fall within a categorical exception. Defamation requires proof that, among other things, the victim was harmed by the defamatory statements. *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (listing the elements of defamation). That is a question of fact, which in this case would have turned on, for example, whether the jury believed S.S.'s testimony about the anguish the letter and email wrought. The jury instructions, however, did not require the jury to find that Mr. Keerikkattil's conduct actually harmed S.S., only that he "should have known his conduct would cause a reasonable person in [S.S.]'s circumstances" harm. The absence of a harm instruction ordinarily would pose no issue because D.C. Code § 22-3133 does not require injury. But defamation does. If the government believes that the letter and email constituted defamation, then the failure to instruct the jury that it needed to find that those communications injured S.S. was error.[4]

---

[4] D.C. law may not define defamation conterminously with the constitutional categorical exception. In other words, the contours of D.C. defamation law may differ from those of the First Amendment's categorical exception for defamatory speech. Presumably, the defamation laws of the fifty states (and the District) vary, but the First Amendment speaks with a single voice. As a result, the categorical exception may be broader than D.C. defamation law, and some speech might fall within that categorical exception even if a defendant would not be liable for defamation under D.C. law. *Cf. United States v. Alvarez*, 567 U.S. 709, 718-19 (2012) (plurality opinion) (discussing some of the contours of the categorical exception for defamation). We understand *Mashaud* to be referring to this categorical exception—as opposed to specifically D.C.'s defamation law—because

Although the trial court erred, and that error was clear or obvious, the government's aforementioned arguments—that the jury could have considered at least some of the evidence and would have found Mr. Keerikkattil guilty anyway—are relevant to the substantial-rights prong of plain-error review, to which we now turn. We hold that the instructional error did not affect Mr. Keerikkattil's substantial rights. An error affects substantial rights if the defendant shows "a reasonable probability of a different outcome but for the established error." *Geter v. United States*, 306 A.3d 126, 139 (D.C. 2023) (internal quotation omitted). The standard requires "[m]ore than a mere possibility of prejudice"; the error must "undermine[ ] confidence in the trial's outcome." *Id.* at 140 (internal quotation omitted).

In the context of this case, Mr. Keerikkattil must establish a reasonable probability that, if a *Mashaud*-based instruction had been provided,[5] the jury would

---

it was grounded in First Amendment principles. In this case, however, we need not delve into whether and where the categorical exception and D.C. law differ because the government relies on the definition in D.C. defamation law in its briefs to this court.

[5] Mr. Keerikkattil does not propose any particular instruction beyond arguing that the jury should have been instructed in a manner consistent with *Mashaud*'s narrowing of the stalking statute, presumably as a part of the court's final jury instructions articulating the elements of stalking. He does not further argue that any particular evidence should have been excluded or should have been accompanied by a limiting instruction restricting its usage and consideration in any particular way. We can imagine a number of difficult questions that might arise had such arguments been preserved and argued before us. But they have not been, and we will not manufacture them on our own—particularly on plain-error review.

not have found that on at least two occasions he knew or should have known that his intentional conduct would cause S.S. emotional distress. At trial, the government relied on nine occasions: (1) the June 28 litigation-hold email to Mr. Rajan and S.S. alleging an inappropriate workplace relationship between the two; (2) the July 6 email to S.S. and other Deloitte employees accusing her of, among other things, blatant fraud; (3) the July 28 email to S.S. warning her that she might end up paying damages for the rest of her life unless she told the truth; (4) the August sighting at the café near Deloitte's office; (5) the September letter to the IRS alleging S.S. had been fired for illegal drug use; (6) the October 1 text messages blaming S.S. for ruining Mr. Keerikkattil's life and pledging to fight back; (7) the October 9 text messages promising revenge; (8) the October 24 visit to S.S.'s parents; and (9) the text messages Mr. Keerikkattil sent after visiting S.S.'s parents. We must determine whether there exists a reasonable probability that if the jury had been presented with only the subset of this evidence that it could properly consider under *Mashaud*, it would have reached a different result. Although the government pressed all nine occasions at trial, a conviction requires only two occasions, and we focus our analysis on the final two occasions: the Oregon trip and the subsequent text messages.

Before conducting this analysis, we note that our blindness to the content of speech applies only to the speech being regulated. We may consider the content of

other communications as evidence that informs our conclusions about whether the actus reus conduct at issue was likely to cause S.S. emotional distress. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."); *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014) (nonprecedential) (affirming a conviction for distributing material in support of a foreign terrorist organization because the defendant's "political beliefs were introduced to prove the *mens rea* element of the charged crimes" and the evidence "was admitted not as inherently criminal conduct, but as proof that [the defendant] knowingly and intentionally committed the charged offense"); *see also United States v. Stewart*, 686 F.3d 156, 161-62, 171 & n.17 (2d Cir. 2012) (holding that the defendant's confession was not regulated speech in a prosecution about whether other communications had violated "Special Administrative Procedures" that she had agreed to and analogizing the argument to one that the use of a murderer's confession would violate the First Amendment). Given that we are analyzing the government's evidence as if the only "occasions" for purposes of the criminal course of conduct were the Oregon trip and subsequent text messages, consideration of the content of other communications as context for these

communications does not trigger First Amendment scrutiny because the other communications are not themselves being regulated. Consequently, we may consider, as a jury may have considered, the content of Mr. Keerikkattil's prior communications to determine the potential for the Oregon trip and the subsequent text messages to inflict emotional distress on someone in S.S.'s circumstances.

The first occasion we consider in Mr. Keerikkattil's course of conduct is the Oregon trip. Although the trip was an indirect communication to S.S. because it conveyed a message to her, *see* D.C. Code § 22-3132(3) (defining communicating), Mr. Keerikkattil does not argue that the jury could not consider this expressive conduct. Nor does he address whether the expressive aspects of the trip are severable from the conduct such that the jury could consider the conduct without infringing on the expression. Instead, he focuses his argument on the emails, letters, and text messages he sent. Under plain-error review, the burden fell on Mr. Keerikkattil to show that consideration of the Oregon trip was erroneous. *See Geter*, 306 A.3d at 131. By failing to argue the point, he has not carried his burden.

Mr. Keerikkattil should have known that the trip would cause someone in S.S.'s circumstances emotional distress. Mr. Keerikkattil flew across the country and then drove over three hours from the airport to the house of S.S.'s parents. S.S. had never told Mr. Keerikkattil where her parents lived, and he had never met them.

Mr. Keerikkattil's trip conveyed both the lengths to which he was willing to go to hurt S.S. as well as a suggestion that his retributive efforts might reach her loved ones too. As S.S. testified, she understood perfectly the message Mr. Keerikkattil was sending her, and she found it "very alarming."

The second occasion we consider is the series of text messages Mr. Keerikkattil sent S.S. after his Oregon trip, looking not to their content but only to the fact of their communication, which *Mashaud* allows. Our decision in *Mashaud* did not reach all aspects of communication. Beyond permitting the statute to cover speech within the categorical exceptions to First Amendment protection, *Mashaud* also left intact Section 22-3133's regulation of communications that do not turn on the communications' content. *See id.* at 1160-61 (distinguishing cases that did not "depend[ ] on the sort of content-based speech restriction that would be excluded from the stalking statute's scope under the construction we adopt"); *see also Atkinson v. United States*, 121 A.3d 780, 782-83 (D.C. 2015) (involving "back-to-back" calls "throughout the evening" and "into the early morning hours" and continued outreach after being repeatedly told to cease contact); *Whylie v. United States*, 98 A.3d 156, 161 (D.C. 2014) (concerning "thousands of phone calls" to the victim over the course of a month and, for a separate count, 800 calls that violated a no-contact order). If the stalking stemmed from the mere fact of communication, as opposed to the contents of the communication, *Mashaud*'s saving construction of

Section 22-3133 poses no barrier. *See Mashaud*, 295 A.3d at 1160-61 ("[I]t is only when a stalking charge depends on the content of one's speech that our narrow interpretation of the statute's application to speech comes into play."); *Counterman v. Colorado*, 600 U.S. 66, 86 (2023) (Sotomayor, J., concurring) ("The content of the repeated communications can sometimes be irrelevant, such as persistently calling someone and hanging up, or a stream of utterly prosaic communications." (internal quotation omitted)). A jury may consider the act of sending the communication—but not what lay within the communication—as part of a "course of conduct" that the defendant "should have known" would inflict "emotional distress" upon the victim. D.C. Code § 22-3133; *see Mashaud*, 295 A.3d at 1160-61.

The mere fact of sending a few text messages might not ordinarily amount to criminal stalking. In this case, however, context proves otherwise. To be sure, "to trigger criminal liability, the level of fear, alarm, or emotional distress must rise significantly above that which is commonly experienced in day to day living and must involve a severe intrusion on the victim's personal privacy and autonomy." *Coleman v. United States*, 202 A.3d 1127, 1146 (D.C. 2019) (brackets, citation, and internal quotations omitted); *see* D.C. Code § 22-3132 ("'Emotional distress' means significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling . . . ."). In our view, the fact

of communication from Mr. Keerikkattil's October 24 text messages satisfies that threshold.

Mr. Keerikkattil's relationship with S.S. had already deteriorated before he sent the texts. Mr. Keerikkattil himself had demanded in a cease and desist letter that S.S. "refrain from contacting [him] except for legitimate business needs of Deloitte LLP"; S.S. had filed a formal complaint against Mr. Keerikkattil at Deloitte; and S.S.'s lawyer had "instructed" Mr. Keerikkattil "to direct any communications intended for [S.S.], regardless of subject matter or context, exclusively to [the lawyer] or [their] designee(s)." Mr. Keerikkattil had sent letters and emails to S.S.'s employer and a government agency trying to get her fired and suggesting that she might face criminal liability. Mr. Keerikkattil had also texted S.S. and threatened to "fight" her, accused her of making his "life hell," and told her he planned to "fuck up [her] life." On top of all of this, the October 24 text messages arrived on the heels of Mr. Keerikkattil's Oregon trip, which imparted its own menacing message. On that same day, Mr. Keerikkattil sent S.S. six new text messages.[6] This after S.S. had declined to respond to any of Mr. Keerikkattil's text messages over the last few

---

[6] Mr. Keerikkattil has not argued that the Oregon trip and the subsequent text messages should be considered as a single occasion because they occurred on the same day. *See* D.C. Code § 22-3133(c) ("Where a single act is of a continuing nature, each 24-hour period constitutes a separate occasion."). We thus express no view on whether the Oregon trip and subsequent texts constituted "a single act of a continuing nature." *Id.*

months—except on one occasion to ask who was texting her when he reached out from a new number. The combination of (1) explicit instructions not to contact S.S., (2) Mr. Keerikkattil's declared intent to "fight" S.S. and "fuck up [her] life," (3) Mr. Keerikkattil's prior efforts to sabotage S.S. through reports to her superiors and the IRS, and (4) the recent Oregon trip convinces us that Mr. Keerikkattil should have known that the mere fact of additional communication was likely to instill emotional distress in S.S. At this point, each new communication from Mr. Keerikkattil—irrespective of its content—reflected another intrusion into S.S.'s life from which she could not escape. The harm from the fact of communication in these text messages thus rose above "that which is commonly experienced in day to day living" and crossed into "a severe intrusion on a victim's personal privacy and autonomy." *Coleman*, 202 A.3d at 1146.

We discern no reasonable probability that the jury would have reached a different conclusion if it considered only the harm inflicted by the Oregon trip and the fact of communication from the following text messages. Although the government presented more occasions at trial, it was required to prove only two occasions in which Mr. Keerikkattil "communicate[d] to" S.S. in a manner he should have known was likely "to cause a reasonable person in [her] circumstances" to "[s]uffer emotional distress." D.C. Code §§ 22-3132(8)(A), -3133(a)(3). Accordingly, we hold that the trial court did not plainly err, because the error did not

affect Mr. Keerikkattil's substantial rights. *See* D.C. Super. Ct. Crim. R. 52(b) (defining plain error as errors that "affect[ ] substantial rights").[7]

## B.      Sufficiency of the Evidence

Next, Mr. Keerikkattil argues that the government presented insufficient evidence for the jury to convict him of stalking. Our conclusion that the government presented sufficient evidence to support the conviction follows from our conclusion above that the instructional error did not affect Mr. Keerikkattil's substantial rights, because there was other evidence to support a conviction.

When reviewing for sufficiency of the evidence, this court "view[s] the evidence in the light most favorable to the government, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and [we] mak[e] no distinction between direct and circumstantial evidence." *White v. United States*, 207 A.3d 580, 587 (D.C. 2019) (internal quotation omitted). This court will affirm "if any rational fact-finder could have found the elements of the crime beyond a reasonable doubt." *Id.* (internal quotation omitted). Sufficient evidence in this case requires at least two occasions that satisfy

---

[7] Because we conclude that Mr. Keerikkattil has not established that the error affected his substantial rights, we need not address the fourth prong of plain-error review.

*Mashaud* and thus could form a course of conduct directed at S.S. that Mr. Keerikkattil "should have known would cause a reasonable person in [S.S.'s] circumstances" emotional distress. *See* D.C. Code §§ 22-3132(8), -3133(a)(3).

As we explained above, by visiting S.S.'s parents and by texting S.S. directly after the visit, Mr. Keerikkattil acted in a way he "should have known would cause a reasonable person in [S.S.'s] circumstances" emotional distress on two occasions. *Id.* § 22-3133. Based on the Oregon trip and the fact of communication from the subsequent text messages, we hold that the government presented sufficient evidence to support a conviction.

## C. Jurisdiction

Mr. Keerikkattil argues that the trial court lacked jurisdiction over his case. He contends that the government failed to prove that any of the actions that form his alleged course of conduct occurred within the District of Columbia. We disagree.

### 1. Standard of Review and Applicable Law

We review jurisdictional questions de novo. *Lucas v. United States*, 305 A.3d 774, 776 (D.C. 2023). The D.C. Council provided the Superior Court with statutory jurisdiction over "any criminal case under any law applicable exclusively to the District of Columbia." D.C. Code § 11-923(b)(1); *see also id*. § 22-3135(a)

(providing a potentially more permissive grant of jurisdiction in stalking cases). This court has long interpreted Section 11-923(b)(1) to confer jurisdiction over "criminal act[s]" "occur[ing] within the geographic boundaries of the District of Columbia." *Dobyns v. United States*, 30 A.3d 155, 157 (D.C. 2011). An act occurs within the District if "one of several constituent elements to the complete offense" happened in D.C. *Id.* at 157-58 (internal quotation omitted).

## 2. The Superior Court Possessed Jurisdiction

We conclude that the Superior Court had jurisdiction over this case. For the reasons explained above, our decision to affirm Mr. Keerikkattil's conviction relies only on the Oregon trip and subsequent text messages. The government presented uncontroverted evidence that S.S. learned of the Oregon trip and then received Mr. Keerikkattil's text messages while she was in her D.C. apartment. Because the jury was required to find that Mr. Keerikkattil "directed" his communications at S.S., *see* D.C. Code § 22-3133(a), it is sufficient for purposes of jurisdiction that S.S. received those communications in the District. *See United States v. Baish*, 460 A.2d 38, 43 (D.C. 1983) (holding that where "communication" is an "integral component[ ] of the offense," "if [the communication] is heard by someone within the District of Columbia," "the Superior Court properly will entertain jurisdiction over an ensuing prosecution" "regardless of where [the defendant] utters the

[communication]").  Mr. Keerikkattil does not dispute this evidence.  Accordingly, the Superior Court possessed jurisdiction in this case.

### D.      Sentencing

Finally, Mr. Keerikkattil challenges his sentencing.  He does so in two ways: first, he argues that the trial court erred in remanding him to the Bureau of Prisons because he was sentenced for a misdemeanor rather than a felony; second, he argues that the trial court erred in sentencing him to probation over his objection.

With respect to the first argument, Mr. Keerikkattil contends that courts' authority to send convicted defendants to the Bureau of Prisons derives from D.C. Code § 24-101, which applies exclusively to felons.  *See* D.C. Code § 24-101. Mr. Keerikkattil argues that he was convicted of only a misdemeanor.  The government does not contest this argument but submits that Mr. Keerikkattil was not harmed by any error.  Although the trial court stated that Mr. Keerikkattil would be "remanded to the custody of the Bureau of Prisons" as it imposed his sentence, the government represents—and Mr. Keerikkattil does not dispute—that he was not remanded to the Bureau of Prisons but rather served his eleven months at a D.C. Correctional Treatment Facility.

We agree with the government. Even assuming the trial court erred, we hold that Mr. Keerikkattil was not harmed by the trial court's order that he be remanded to the Bureau of Prisons because he was not, in fact, remanded to the Bureau of Prisons. Mr. Keerikkattil asks us to consider the error in "context with all the other errors that occurred," but we fail to see how this error affected Mr. Keerikkattil in any respect because it affected neither the jury's finding of guilt nor the sentence he actually served.

Mr. Keerikkattil's second argument is that the trial court erred by sentencing him to probation over his objection. Mr. Keerikkattil was subject to a maximum prison sentence of twelve months of incarceration. *See* D.C. Code § 22-3134(a). But the government requested a "lengthy period of probation" in order to adequately "punish[ ]" Mr. Keerikkattil for his conduct. It suggested suspending one month of a twelve-month sentence and imposing five years of probation. Mr. Keerikkattil's counsel expressly objected to probation, stating that his "client is unwilling to do probation and [he would] be requesting . . . a 12-month sentence." The trial court nevertheless accepted the government's recommendation and imposed an eleven-month sentence with one month suspended and five years of supervised probation.

D.C. law prohibits the imposition of probation without the defendant's consent. *See* D.C. Code § 16-710(a) ("A person may not be put on probation without

his consent."); *Jamison v. United States*, 600 A.2d 65, 70-71 (D.C. 1991) ("Where counsel or the defendant fairly manifests an apparent objection to the probation . . . the trial court cannot proceed to impose probation without obtaining an explicit consent on the record, to ensure compliance with the command of the statute."). Mr. Keerikkattil argues that because he objected to probation, the trial court could not sentence him to probation. The government concedes error, and we agree that, to the extent Mr. Keerikkattil was sentenced to probation over his objection, the trial court erred.

Despite conceding error on the merits, the government argues that we should not consider Mr. Keerikkattil's argument in the first place, because he raised it solely in a Rule 28(k) letter submitted after he filed his opening brief. Rule 28(k) letters are designed for the specific, and limited, purpose of apprising the court of "significant authorities" that have "come to a party's attention after the party's brief has been filed, or after oral argument but before decision." D.C. App. R. 28(k). "The letter must state *without argument* the reasons for the supplemental citations . . . ." *Id.* (emphasis added). Because Mr. Keerikkattil's letter included an argument, the government urges us to ignore it as improper.

We agree that, in general, parties may not exploit Rule 28(k) by raising new arguments outside their briefs, particularly when those arguments do not rely on

subsequent legal authority. *See United States v. Jones*, 308 F.3d 425, 427 n.1 (4th Cir. 2002) (declining to consider an argument raised for the first time in a Rule 28(j) letter and holding that "[b]ecause this argument was not presented in [appellant's] opening brief, it is waived"); *United States v. Nason*, 9 F.3d 155, 163 (1st Cir. 1993) ("[Appellant] did not make this argument in his brief, and a letter submitted pursuant to [R]ule 28(j) *cannot* raise a new issue." (alteration in original) (internal quotation omitted)); *Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1404 (8th Cir. 1992) (agreeing with appellee that Rule 28(j) cannot be used "to raise an entirely new issue that might have been raised long before the case was submitted").[8] The reason for this general

---

[8] We consider federal courts' interpretations of Fed. R. App. P. 28(j) before December 2002 as persuasive authority with respect to interpreting D.C. App. R. 28(k). "When a local rule and a federal rule are identical, or nearly so, we will construe the local rule in a manner consistent with the federal rule to the extent possible under binding precedent . . . ." *Wendemu v. Tesema*, 304 A.3d 953, 961 n.4 (D.C. 2023) (quoting *Montgomery v. Jimmy's Tire & Auto Ctr., Inc.*, 566 A.2d 1025, 1027 (D.C. 1989)) (looking to federal-court decisions to aid in interpreting D.C. Super. Ct. Civ. R. 30(c)(2) and (d)(2)). Before December 2002, Fed. R. App. P. 28(j) essentially mirrored the current D.C. App. R. 28(k). *Compare* D.C. App. R. 28(k), *with* Fed. R. App. P. 28(j) (2001). In December 2002, however, the Supreme Court amended Fed. R. App. P. 28(j) to omit the phrase "without argument" and replaced it with a 350-word limit for supplemental-authority letters, *see* Fed. R. App. P. 28(j) (2002), "in part because of the difficulty distinguishing" between arguments and reasons for the supplemental citation. Fed. R. App. P. 28 advisory committee note to the 2002 amendment. Despite the 2002 amendments, federal courts continue to disapprove of new arguments raised in Rule 28(j) letters, at least without some intervening change in law. *See, e.g., United States v. Ashford*, 718 F.3d 377, 381 (4th Cir. 2013) ("We do not countenance a litigant's use of Rule 28(j) as a means to advance new arguments couched as supplemental authorities."); *Niemi v. Lasshofer*, 728 F.3d 1252, 1262 (10th Cir. 2013) (Gorsuch,

rule is that allowing parties to raise additional arguments after briefing denies the opposing party an opportunity to respond and thus deprives the court of the full benefit of the adversarial process. *See S.C. Elec. & Gas Co. v. Interstate Com. Comm'n*, 734 F.2d 1541, 1546 (D.C. Cir. 1984) (declining to consider a Rule 28(j) letter that raised an argument "to which respondent and intervenor have no opportunity to reply" and characterizing the letter as a "strategy" used "to supplement [petitioner's] argument"); *see also Ashford*, 718 F.3d at 381 ("Indeed, considering an argument advanced for the first time in a Rule 28(j) filing is not only unfair to the appell[ant], it also creates the risk of an improvident or ill-advised opinion being issued on an unbriefed issue." (internal quotation omitted)); *Niemi*, 728 F.2d at 1262 ("[A]llowing Rule 28(j) letters to be used to introduce any sort of new issue after briefing is complete [ ] risks leaving opponents with no opportunity (at least if they abide the rules of appellate procedure) for a proper response; it risks an improvident opinion from this court by tasking us with the job of issuing an opinion without the full benefits of the adversarial process; and it invites an unsavory degree of tactical sandbagging by litigants in future cases . . . .").

---

J.) ("The proper function of Rule 28(j) letters, after all, is to advise the court of 'new authorities' a party has learned of after oral argument, not to interject a long available but previously unmentioned issue for decision.").

In our view, the reasons courts typically ignore new arguments raised without cause in supplemental-authority letters apply with negligible force in this case. Two considerations combine to convince us that, under the circumstances here, we need not blind ourselves to Mr. Keerikkattil's admittedly improperly raised argument. First, the government suffered no prejudice. Mr. Keerikkattil filed the Rule 28(k) letter months before the United States submitted its response brief and a week before the government successfully moved to extend its time to file that brief. The government had ample opportunity to respond to the argument in its response brief, and it took advantage of that opportunity. We thus enjoy the benefit of the government's full response. Second, the merits are straightforward. The government conceded error. As a result, fear of incorrectly resolving the merits of the issue need not hold us back.

To be sure, Mr. Keerikkattil should have moved either to amend his opening brief or to file a supplemental brief. *Cf. Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (approving the use of a request for additional briefing to discuss a new issue). We decline, however, to apply Rule 28(k) so rigidly as to ignore an uncontested issue that the opposing party had an opportunity to brief. Because we hold that the trial court erred in sentencing Mr. Keerikkattil to probation over his opposition, we remand for it to impose a new sentence consistent with this opinion.

### III.  Conclusion

For the foregoing reasons, we affirm Mr. Keerikkattil's conviction and remand for the trial court to resentence him consistent with this opinion.

*So ordered.*